STATE OF NORTH CAROLINA v. DARRYL EUGENE HUNT

No. 507A85

(Filed 4 May 1989)

**1. Criminal Law § 89.4— prior inconsistent statements—erroneously admitted**

The trial court erred in a prosecution for felony murder by admitting the prior inconsistent statements of a fourteen-year-old retarded prostitute which, if true, strongly contradicted defendant's evidence as to his whereabouts the night of the crime. Once the court determined that the witness was hostile or unwilling, it properly permitted the State to subject her to cross-examination; however, the trial court erred by permitting an officer to testify as to the substance of the prior statements denied by the witness. The proper use of the prior statements to corroborate the officer's testimony would have been only to demonstrate the fact that the witness made statements to him on a particular date, not to prove the facts those statements purported to relate. The likelihood that the jury would confuse the substance of the statements with their use for purposes of impeachment was compounded by the nature of the trial court's limiting instructions.

**2. Criminal Law § 66.5— lineup identification—right to counsel denied—no prejudice**

There was no prejudicial error in a prosecution for felony murder in admitting the results of a lineup identification where the lineup took place in the lobby of one of the floors of the jail; the witness rode an elevator to that floor and observed the lineup through the elevator door window; neither of defendant's counsel was allowed in the elevator with the witness and an officer; and defendant did not object when the witness identified him before the jury as the man he had picked out of the lineup. Failure to object when identification is made before the jury is a waiver of the right to have the propriety of that identification considered by the appellate court.

Justice MITCHELL dissenting.

Justice MEYER joins in the dissenting opinion.

APPEAL by defendant from judgment sentencing him to life imprisonment for conviction of murder in the first degree, said judgment imposed by *Cornelius, J.,* at the 28 May 1985 session of Superior Court, FORSYTH County. Heard in the Supreme Court 14 March 1989.

*Lacy H. Thornburg, Attorney General, by Steven F. Bryant, Assistant Attorney General, for the state.*

*Adam Stein for defendant.*

MARTIN, Justice.

Defendant was convicted of murder in the first degree based upon the felony murder doctrine and sentenced to life imprisonment. Although defendant raises several assignments of error, we find it necessary to discuss only one: The state's introduction of hearsay evidence for impeachment, corroborative, and substantive purposes was improper, and the prejudicial effect of that evidence entitles the defendant to a new trial.

Evidence presented by the state tended to show that the victim was raped and stabbed to death at approximately 6:45 a.m. on 10 August 1984 in Winston-Salem. Three witnesses for the state identified defendant as the man they had seen in inculpatory circumstances shortly before, during, and after the assault on the victim. The first witness had driven past a black man and a white woman walking closely together near the field where the victim's body was later found. The witness identified defendant less than one month later from both photographic and in-person lineups. A second witness walking by the same field at around 6:40 a.m. actually observed the assault and called to report it. The witness testified that he had gotten a good look at the face of the assailant, whom he identified in court as defendant. This witness had also identified defendant in photographic and in-person lineups. The state's third witness was employed by a hotel in downtown Winston-Salem. At approximately 6:45 a.m. he had seen a black male enter the hotel lobby and go directly to the men's room. The witness testified that he had seen this man on at least three other occasions when the man had asked to use the restroom. Because on this occasion the man remained so long in the restroom, the employee asked a security guard to tell him to leave. The employee entered the restroom about a half-hour later and saw red-tinted water in the sink and bloody paper towels. Although this witness did not make a connection between the man he had seen and defendant until he saw the latter's picture in the paper almost a year after the murder, he positively identified defendant as the man who had used the restroom.

Defendant testified that he and his friend Sammy Mitchell had spent the night of 9 August at the McKee household, arriving around 6 p.m. and coming and going until around 11 or 11:30, when he fell asleep in a living room chair. Defendant testified

that he had wakened around 7:30 the next morning and had left with Sammy around 8:30, taking the bus downtown, stopping for breakfast, then going on to the courthouse where Mitchell had to make an appearance. Sammy Mitchell attested to essentially the same whereabouts, times, and activities involving defendant and himself the 9th and 10th of August. The testimony of three residents of the McKee household similarly corroborated defendant's account of spending the night of 9 August in that house and not leaving until sometime after 7 a.m.

Marie Crawford, a fourteen-year-old prostitute, was called by the state to testify. After preliminary questions eliciting her acknowledgment of her occupation and her close friendship with defendant, the prosecutor asked her directly whether she had ever come to his office and given him a statement. She admitted that she had come to his office but first denied, then stated she could not recall, having given him or the police detective a statement. Defendant objected to the state's offer to refresh the witness's memory as to the statements, and a voir dire followed.

During the voir dire, Marie Crawford was reminded of two statements she had made to police officers, and signed transcriptions of those statements were shown to her. Marie repeatedly denied knowledge or memory of these, admitting that it was her signature subscribed on the statements, but denying any memory of uttering the transcribed words or of signing the paper upon which they had been written. The statements as read to the witness on voir dire, if believed, strongly contradicted defendant's evidence as to his whereabouts the night of 9-10 August:

> [O]n August 10th Mr. Darryl Hunt and Sammy Mitchell were at Motel 6 and Darryl Hunt and Sammy Mitchell left the room at about 6:00 a.m. and that they were both wearing black shirts and black pants and Darryl told me he was going to call a cab. The next time I saw Darryl was about 9:30 a.m. and he was nervous when he came back to the motel room and he said he needed a drink. Darryl had mud or grass stains on his pants knees[.]

> [A]bout two weeks ago me and Darryl were at Motel 6 and Darryl was saying some stuff about the white lady that got killed downtown and Darryl said that Sammy did it when we were watching the Crimestoppers on the news and the televi-

sion and I said to Darryl I wish I knew who killed that lady because I could use the money and Darryl said Sammy did it and he fucked her too.

At the conclusion of Marie's voir dire testimony, defendant argued that the state should not be permitted to impeach its witness with the prior inconsistent statements, reasoning that the probative value of such would be overwhelmed by its tendency to prejudice defendant. The trial court denied defendant's motion to suppress the statements, concluding that the witness may have been hostile or unwilling, that it was permissible for the state to cross-examine her respecting the alleged statements, and that the relevance and probative value of her testimony would substantially outweigh any danger of unfair prejudice or confusion.

Before the jury, Marie Crawford again denied that she had made the prior statements. Despite the fact that her signature was inscribed beneath both statements and despite her admission that she remembered signing a piece of paper, she persistently denied having made the statements themselves and, to the extent of her knowledge, their truth.

Q. Now, on August 30th, 1984, did you have a conversation with Officer Daulton while you were being detained in this courthouse and being tried for soliciting for prostitution and prostitution?

A. I don't remember.

Q. And do you remember the statement you made to him on that day?

A. No, sir, I don't.

Q. Do you remember that you told him that on the nights of August 9th, 1984 and August 10th, 1984, that you spent the night with Darryl Hunt and Sammy Mitchell and that they were with you at Motel 6 on Patterson Avenue?

A. No, sir, I did not.

Q. Are you saying that you did not make that statement or you don't remember making that statement?

A. I did not make that statement.

Q. And on September the 11th, 1984, did you make a statement to Officer Daulton?

A. No, sir.

Q. Referring to what is marked State's Exhibit No. 38, would you look at Exhibit 38 and I'll ask you if that is a statement that you made?

A. I do not remember making this statement.

Q. Is that your signature on that statement?

A. Yes, sir.

Q. And did you make the following statement to Officer —

At this point defendant objected, but the trial court, inquiring whether Officer Daulton would later be testifying, overruled defendant's objection "for [the] purpose of corroborating the testimony of a later witness" and instructed the jury accordingly. The two statements were then read to the jury.

These statements were reintroduced through the testimony of the police detective to whom they had been made. The officer testified that Marie had recounted the substance of the first statement to him in an interview on 30 August 1984, and that this and the second statement were both transcribed on 11 September. He testified that he had read the transcriptions to her and had allowed her to read them before she signed them. When the state offered the statements themselves into evidence, defendant objected again, reminding the court that, as he had understood the court's prior ruling, the admission of the statements was not to be as substantive evidence but only for the purpose of challenging credibility. The court overruled defendant's objection and allowed the introduction of both statements into evidence without a limiting instruction.

In its final charge to the jury, the trial court instructed the jury that it had heard evidence that Marie Crawford had made prior statements that conflicted with her testimony at trial, but that the jury must not consider the earlier statements as evidence of the truth of what was said at that earlier time; however, such evidence could be considered by the jury in determining the

credibility of the witness. Nevertheless, in recapitulating the testimony of Officer Daulton, the court reiterated the substance of both statements.

A.

[1] Analyzing whether these statements were properly used at defendant's trial is complicated in this case by the fact that they appear to have been admitted for both credibility and substantive purposes under the authorization of more than one of the North Carolina Rules of Evidence. In order to determine whether these statements were properly admitted for any one purpose, it is necessary to examine not only the defendant's stated grounds for objection and the trial court's reason for admitting the statements on each occasion, but also the purposes for which they were actually used.

After voir dire of Marie Crawford, the trial court ruled the statements admissible for the purpose of impeaching the credibility of that witness, a practice that North Carolina's Evidence Code expressly permits: "The credibility of a witness may be attacked by any party, including the party calling him." N.C.G.S. § 8C-1, Rule 607 (1988). It is a logical corollary to this rule that the cross-examination of a party's own witness be governed by the same rules that govern the cross-examination of witnesses called by the opposing party. These include the rule that extrinsic evidence of prior inconsistent statements may not be used to impeach a witness where the questions concern matters collateral to the issues. *E.g.*, *State v. Greene*, 296 N.C. 183, 250 S.E. 2d 197 (1978). Such collateral matters have been held to include testimony contradicting a witness's denial that he made a prior statement when that testimony purports to reiterate the substance of the statement. *See, e.g.*, *State v. Williams*, 322 N.C. 452, 368 S.E. 2d 624 (1988); *State v. Cutshall*, 278 N.C. 334, 180 S.E. 2d 745 (1971); *State v. Moore*, 275 N.C. 198, 166 S.E. 2d 652 (1969).

The same principles govern the admissibility of Marie Crawford's prior statements for purposes of impeachment in this case. Once the trial court determined that Marie was a hostile or unwilling witness, it properly permitted the state to subject her to cross-examination. However, the trial court erred in permitting Officer Daulton to testify as to the substance of the prior statements denied by Marie. Officer Daulton could properly have been

called to contradict the fact, denied by Marie, that she had made the statement to him on the specified date. But, as this Court made clear in *Williams*, "it was improper to impeach [her concerning what she had or had not told Officer Daulton] by offering the testimony of [Officer Daulton]." 322 N.C. at 456, 368 S.E. 2d at 626.

### B.

The trial court applied Rule 403 to balance the impeachment value of the statements against their tendency to prejudice defendant unfairly or to confuse the jury. Although unsworn prior statements are not hearsay when not offered for their truth, the difficulty with which a jury distinguishes between impeachment and substantive evidence and the danger of confusion that results has been widely recognized. *E.g., United States v. Webster*, 734 F. 2d 1191 (7th Cir. 1984); *United States v. Morlang*, 531 F. 2d 183 (4th Cir. 1975). *See also* 3 D. Louisell & C. Mueller, *Federal Evidence* § 299 (1979). For this reason, the "overwhelming weight of [federal] authority" with regard to the use of the identical Fed. R. Evid. 607 has long been "that impeachment by prior inconsistent statement may not be permitted where employed as a *mere subterfuge* to get before the jury evidence not otherwise admissible." *United States v. Morlang*, 531 F. 2d 183, 190. *See also United States v. Hogan*, 763 F. 2d 697, *withdrawn in part on other grounds*, 771 F. 2d 82 (5th Cir. 1985) (a party may not introduce prior inconsistent statements "under the guise of impeachment for the *primary* purpose of placing before the jury substantive evidence which is not otherwise admissible." 763 F. 2d at 702 (quoting *United States v. Miller*, 664 F. 2d 94, 97 (5th Cir. 1981), *cert. denied*, 459 U.S. 854, 74 L.Ed. 2d 106 (1982)). As Judge Posner noted in *Webster*, it is taking advantage of the jury's likely confusion regarding the limited purpose of impeachment evidence that has moved federal appellate courts to scrutinize the use of hearsay evidence for the impeachment of a party's own witness.

> [I]t would be an abuse of [Rule 607], in a criminal case, for the prosecution to call a witness that it knew would not give it useful evidence, just so it could introduce hearsay evidence against the defendant in the hope that the jury would miss

the subtle distinction between impeachment and substantive evidence—or, if it didn't miss it, would ignore it.

*United States v. Webster*, 734 F. 2d 1191, 1192, *quoted in United States v. Peterman*, 841 F. 2d 1474, 1479 (10th Cir. 1988), *cert. denied*, --- U.S. ---, 102 L.Ed. 2d 774 (1989).

It is the rare case in which a federal court has found that the introduction of hearsay statements by the state to impeach its own witness was not motivated primarily (or solely) by a desire to put the substance of that statement before the jury. Circumstances indicating good faith and the absence of subterfuge in these exceptional cases have included the facts that the witness's testimony was extensive and vital to the government's case, *United States v. DeLillo*, 620 F. 2d 939 (2d Cir.), *cert. denied*, 449 U.S. 835, 66 L.Ed. 2d 41 (1980); that the party calling the witness was genuinely surprised by his reversal, *United States v. Webster*, 734 F. 2d 1191; or that the trial court followed the introduction of the statement with an effective limiting instruction, *DeLillo*, 620 F. 2d 939; *United States v. Long Soldier*, 562 F. 2d 601 (8th Cir. 1977).

Although this Court is not bound by the federal courts' interpretation of Rule 607, we are wise to be guided by it, and the unanimous recognition by the federal circuit courts of the unfairness and potential prejudice of permitting hearsay evidence to be considered substantively under the guise of impeachment evidence is impressive. *See United States v. Peterman*, 841 F. 2d 1474; *United States v. Frappier*, 807 F. 2d 257 (1st Cir. 1986), *cert. denied*, 481 U.S. 1006, 95 L.Ed. 2d 203 (1987); *United States v. Johnson*, 802 F. 2d 1459 (D.C. Cir. 1986); *Balogh's of Coral Gables, Inc. v. Getz*, 798 F. 2d 1356 (11th Cir. 1986) (en banc); *United States v. Sebetich*, 776 F. 2d 412 (3d Cir. 1985), *reh'g denied*, 828 F. 2d 1020 (1987), *cert. denied*, --- U.S. ---, 98 L.Ed. 2d 673 (1988); *United States v. Hogan*, 763 F. 2d 697; *United States v. Webster*, 734 F. 2d 1191; *United States v. Crouch*, 731 F. 2d 621 (9th Cir. 1984), *cert. denied*, 469 U.S. 1105, 83 L.Ed. 2d 773 (1985); *United States v. Fay*, 668 F. 2d 375 (8th Cir. 1981); *United States v. DeLillo*, 620 F. 2d 939; *United States v. Morlang*, 531 F. 2d 183; *United States v. Dye*, 508 F. 2d 1226 (6th Cir. 1974), *cert. denied*, 420 U.S. 974, 43 L.Ed. 2d 653 (1975). It is also persuasive that the North Carolina Court of Appeals in *State v. Bell*, 87 N.C. App.

626, 362 S.E. 2d 288 (1987), has disapproved the tactic of masking impermissible hearsay as impeachment in order to get its substance before the jury. *See also State v. Hyleman*, 89 N.C. App. 424, 366 S.E. 2d 530 (1988), *rev'd on other grounds*, 324 N.C. 506, 379 S.E. 2d 830 (1989).

Under the facts of this case, circumstances accompanying the introduction of Marie's prior unsworn statement provide no assurance either that Marie's testimony was critical to the state's case or that it was introduced altogether in good faith and followed by effective limiting instructions. Except for brief testimony about the color of her bicycle, which another of the state's witnesses thought he had seen defendant riding, Marie's testimony consisted entirely of responding to challenges to her credibility and bias. Unlike the extensive testimony of the government's witness in *DeLillo* and the relatively insignificant portion of his testimony that was impeached, there was little if anything of value to the state in Marie's testimony. Moreover, the state appeared to know before Marie was called to the stand that she would not cooperate by reiterating her prior statements. The prosecutor knew that defendant's counsel had visited Marie while she was in jail in Atlanta in 1985. The prosecutor suggested this visit had resulted in convincing Marie she need neither talk to officers nor testify, although Marie denied on voir dire that she had been urged not to talk and said it had been her own decision not to do so. The prosecutor's subsequent question whether Marie had not told officers accompanying her back to North Carolina that she was not going to testify made evident the fact that the state was on notice before the trial began that their witness would not reiterate the unsworn statements it wished the jury to hear.

C.

In this case the likelihood that the jury would confuse the substance of the statements with their use for purposes of impeachment was compounded by the nature of the trial court's limiting instructions. Although the trial court initially indicated that the jury was to consider Marie's prior unsworn statements for the limited purpose of later determining the officer's credibility, the court failed to include a subsequent similar warning either when the statements were read to and denied by Marie or when they were reiterated during the direct examination of the officer.

Instructions regarding the statements during the final charge were no less ambiguous.

Moreover, by the time the statements were actually introduced as exhibits, they were before the jury as substantive evidence, and all earlier apparent efforts to restrict their use to impeachment of Marie or corroboration of the officer's testimony were mooted by their substantive use. "If . . . testimony . . . is not competent as substantive evidence, it is not rendered competent because it tends to corroborate some other witness." *State v. Lassiter*, 191 N.C. 210, 216, 131 S.E. 577, 579 (1926). Defendant realized this and objected; his objection was erroneously overruled. Unless exempted by the rules of evidence or by statute, hearsay is not admissible. N.C.G.S. § 8C-1, Rule 802 (1988). Marie's unsworn statements are not exempt from this rule by virtue of any exception listed in Rules 801, 803, or 804, or under any other evidentiary exception. Furthermore, to offer statements that the declarant has disavowed in corroboration of the testimony of one witness does not strengthen the witness's credibility. "In no aspect of the law of evidence can contradictory evidence be used as corroborating, strengthening, or confirming evidence." *Lassiter*, 191 N.C. at 213, 131 S.E. at 579.

### D.

The state's contention that the challenged testimony was competent as corroboration of Officer Daulton is without merit. The proper use of Marie's prior statements to corroborate the testimony of Officer Daulton would have been only to demonstrate the fact that Marie had made statements to him on a particular date, not to prove the facts those statements purported to relate. Of those Officer Daulton had no personal knowledge. *See* N.C.G.S. § 8C-1, Rule 602 (1988). The written statements signed by Marie were not prior consistent corroborating statements by the officer, but were hearsay statements by Marie. *See State v. McAdoo*, 35 N.C. App. 364, 241 S.E. 2d 336, *cert. denied*, 295 N.C. 93, 244 S.E. 2d 262 (1978). "The rationale justifying admission of prior consistent statements does not justify admission of extrajudicial declarations of someone other than the witness purportedly being corroborated." 1 Brandis on North Carolina Evidence § 52, at 243 (3d ed. 1988).

### E.

Finally, the challenged written statements, had they been otherwise admissible, also fail the test of N.C.R. Evid. 403: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." The Commentary to Rule 607 speaks directly to the danger of impeachment evidence and to the use of this rule as a check on the improper use of such evidence: "The impeaching proof must be relevant within the meaning of Rule 401 and Rule 403 and must in fact be impeaching." There can be no question that prejudice resulted from the testimony that defendant had returned to Marie's motel room three hours after the murder occurred with "mud or grass" stains on the knees of his pants, and that he was "very nervous and upset" and wanted to "get drunk" and did so. The prejudicial effect of this testimony far outweighed the need to show Marie to be less than credible (especially where the remainder of her testimony included little of value to the state's case) or the need to bolster Officer Daulton's credibility.

Even if Marie's testimony on the subject of the prior statements had not been collateral and the purposes of their introduction had not been suspect as subterfuge, the application of the safeguard test of Rule 403 would properly have excluded them. The trial court's discretion to exclude or admit evidence under Rule 403 is broad, and this Court has observed that the trial court's ruling should be reversed for abuse of discretion only when it can be shown to have been "so arbitrary that it could not have been the result of a reasoned decision." *State v. Thompson,* 314 N.C. 618, 626, 336 S.E. 2d 78, 82 (1985). However, the inculpatory substance of the statement and the doubt surrounding other inculpatory evidence compels the conclusion that the trial court failed to apply Rule 403 correctly. Moreover, the prejudicial effect of the statements, which were not admissible for either corroborative or substantive purposes, indicates the magnitude of the error. Although there were three witnesses who identified defendant as the one they had seen with the victim the morning of her murder, the record reflects doubt about the testimony of each, including the limited opportunity for observation of the witness who drove by, certain discrepancies in the description of the witness who reported the assault, and the belated identifica-

tion of defendant by the third witness. In addition, the record reflects that Marie admitted to having had problems with telling the truth in the past and that she had been told by police officers that she could be placed at the scene of the crime. Her youth, her habit of prevaricating, the fact that she was being held at the time for violating the law, and her fear of being implicated are all facts supporting the possibility that the unsworn statements themselves might have been less than reliable.

For the foregoing reasons, we conclude that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." N.C.G.S. § 15A-1443(a) (1988). Defendant is entitled to a new trial.

[2] We turn now to defendant's contention that the results of the lineup identification by the hotel employee were erroneously introduced to the jury because the circumstances surrounding that identification violated defendant's sixth amendment right to the effective assistance of counsel. Although not necessary to the disposition of this appeal, we discuss this issue for the guidance of counsel and the court in further proceedings in this case.

The voir dire record shows that defendant's two counsel were notified prior to the lineup as to when it would occur, and both were present at the jail. The lineup was to take place in the lobby of one of the floors of the jail. The witness was to ride in an elevator to that floor and observe the lineup through the elevator door window. One of defendant's counsel asked to accompany the witness and officer in the elevator, but he was told by the officer in charge of the lineup that although he could remain in the lobby with the men participating in the lineup, neither of defendant's counsel would be permitted in the elevator. One of defendant's counsel consequently observed the lineup from the lobby but was unable to observe the elevator occupants. The witness testified that the officer in the elevator had neither spoken of nor otherwise indicated any one person in the lineup and that the witness had simply observed the five men and had written down the number corresponding to defendant's position in the line. This was corroborated in the testimony of the officer who accompanied him.

Defendant's right to have counsel present at a post-indictment lineup in which the accused is exhibited to an identifying

witness to a crime is assured by the sixth amendment. *Gilbert v. California*, 388 U.S. 263, 18 L.Ed. 2d 1178 (1967); *United States v. Wade*, 388 U.S. 218, 18 L.Ed. 2d 1149 (1967); *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979), *cert. denied*, 446 U.S. 941, 64 L.Ed. 2d 796 (1980). A defendant is entitled to the presence of counsel in such circumstances in order to prevent or remedy "dangers and variable factors which might seriously, even crucially, derogate from a fair trial." *Wade*, 388 U.S. at 228, 18 L.Ed. 2d at 1158. In *Wade* the Supreme Court recognized that such factors could exist on either the defendant's or the witness's side of the lineup, citing not only suggestive "physical conditions . . . surrounding the conduct of the line-up" itself, 388 U.S. at 230 n.13, 18 L.Ed. 2d at 1159 n.13, but the use of devices obscuring "what is said on the witness's side," *id.*, or the more blatant fingering of the suspect to the witness. *Id.* at 233, 18 L.Ed. 2d at 1161.

Assuming arguendo that defendant's constitutional right of assistance of counsel at the lineup was violated, defendant waived that error by failing to object when the witness later identified him before the jury as the man he had picked out of the lineup. N.C.G.S. § 15A-1446(b) (1988). In *State v. Hammond*, 307 N.C. 662, 300 S.E. 2d 361 (1983), the defendant similarly objected prior to an in-court identification, and a voir dire was held. After the voir dire, however, the defendant failed to object once the identification was actually made in the presence of the jury. This Court held that defendant's failure to object to the witness's identification during trial waived defendant's right to have the propriety of the in-court identification considered on appeal.

The same principle applies here to the introduction of the witness's subsequent testimony that defendant was the man he had previously selected as the man he had seen in the hotel lobby the morning of the murder. Failure to object when identification is made before the jury is a waiver of the right to have the propriety of that identification considered by the appellate court. "An assertion in this Court by the appellant that evidence, to the introduction of which he interposed no objection, was obtained in violation of his rights under the Constitution of the United States, or under the Constitution of this state, does not prevent the operation of this rule." *State v. Foddrell*, 291 N.C. 546, 557, 231 S.E. 2d 618, 626 (1977).

On 19 February 1986, defendant filed with this Court a motion for appropriate relief. This Court, on 15 October 1986, entered an order directing that the motion would be determined after the direct appeal was argued. On 14 November 1988, defendant filed with this Court a supplemental motion for appropriate relief. Having determined that defendant is entitled to a new trial upon his direct appeal, defendant's motions for appropriate relief are now moot, and the same are hereby dismissed.

New trial.

Justice MITCHELL dissenting.

I agree that the trial court erred in allowing the State to impeach the testimony of its witness Marie Crawford by evidence of her prior unsworn statements concerning the whereabouts of the defendant on the morning of the murder in this case. Like the majority, I believe that the "circumstances accompanying the introduction of Marie's prior unsworn statement provided no assurance . . . that Marie's testimony was critical to the state's case . . . ." The State should not have been allowed to impeach Crawford by evidence of those prior unsworn statements.

The majority's conclusion that the defendant has carried *his burden* on appeal of showing that the error was prejudicial, however, is unsupported by the record in this case. Instead, it is clear to me that the trial court's error in allowing the State to impeach its witness by evidence of her prior statements did not affect the outcome at trial. Therefore, I dissent from the holding of the majority awarding the defendant a new trial.

The record on appeal reveals that the State's case against the defendant was overwhelming. A brief review of just some of the State's evidence readily reveals that the evidence erroneously admitted to impeach Crawford was harmless. The State's evidence tended to show that Deborah Sykes was a twenty-six-year-old copy editor for the *Winston-Salem Journal-Sentinel*. She was raped and stabbed to death at approximately 6:45 a.m. on 10 August 1984 in a field off West End Boulevard a few blocks from the offices of that newspaper. She died as a result of sixteen major stab wounds, at least one of which pierced her heart. Abrasions and tearing in the areas of the victim's anus and vagina and the

presence of sperm in both her anus and vagina indicated that the victim had been sexually assaulted and raped.

Thomas Murphy testified that he was forty-five years old and was employed at Hanes Dye and Finishing Company in Winston-Salem. On 10 August 1984, he left home at approximately 6:15 a.m. to drive to work. While at a traffic light at West End Boulevard, he observed the victim and the defendant, Darryl Eugene Hunt, standing on the sidewalk. He thought they were drunk because they appeared to be leaning on each other. He saw the defendant's right arm around the neck of the victim and observed that the defendant was holding the victim's hand with his right hand. Murphy positively identified the two people he saw on that occasion as the victim, Deborah Sykes, and the defendant, Darryl Eugene Hunt. Murphy said that there was no doubt that the defendant was the man he had observed.

Johnny Gray testified that he was walking to a friend's house at approximately 6:40 a.m. on 10 August 1984. While taking a shortcut near the Crystal Towers, he heard a woman scream. He looked over a fence and saw the defendant on top of a woman beating her. He observed the assault for approximately fifteen seconds, during which time the defendant was sitting on the woman's stomach as he hit her in the face and chest. Gray could not tell whether the defendant had a knife in his hand. Although the woman struggled to free herself, she could not do so. The defendant had her arms pinned to the ground with his legs, and she could only kick her legs. At that time, the woman did not have any clothing on below her waist. As Gray walked away from the scene, he turned back and saw the defendant running across Cherry Street. As the defendant ran, he tucked his shirt inside his pants. Gray observed that the zipper to the defendant's pants was down. Gray testified there was no doubt that the defendant was the man he saw.

Gray decided that the best thing he could do was call the police, because he believed the woman was hurt. He went to a telephone booth outside a lounge on Thurman Street where he called the police and told them what he had seen. He used a false name on that occasion, because he did not want to become involved, but later correctly identified himself to the police. He gave the location of the attack on the woman as a field near the Crystal

Towers behind the downtown fire station. The police dispatcher who received the call testified that she erroneously dispatched a police car to the area of another downtown fire station where nothing was discovered.

Roger Weaver testified that on 10 August 1984 he was on duty as an auditor employed by the Hyatt House, a hotel in downtown Winston-Salem. At approximately 6:45 a.m., Weaver observed the defendant enter the hotel and go directly into the restroom. He had observed the defendant in the hotel on at least three prior occasions when the defendant had asked permission to use the restroom. Although the defendant had asked permission to use the restroom on all prior occasions, he did not request permission on the morning of 10 August 1984. When the defendant did not leave the restroom after what seemed a normal period of time, Weaver had a security guard enter the restroom to ask the defendant to leave. Shortly after the defendant left, Weaver entered the restroom and noticed a reddish-pink substance in the sink. He found bloody paper towels in the trash dispenser in the restroom. Weaver testified that he was positive the defendant was the man he had seen enter the restroom on the morning of 10 August 1984.

In light of the positive and unequivocal identification of the defendant by three disinterested eyewitnesses, it strains all credulity to assert that the jury gave any significant weight to evidence concerning unsworn pretrial statements by Marie Crawford, a retarded fourteen-year-old who had been a prostitute since she was eleven and who had spent a good part of her life institutionalized in mental health and juvenile detention facilities. Specifically, there is no realistic possibility that, in rejecting the defendant's alibi evidence, the jury gave any significant weight to the State's "impeachment" evidence that this retarded child prostitute had said she spent the night of 9-10 August 1984 with the defendant at Motel 6 and that he left in the early morning hours and returned with dirt on his pants and appearing nervous.

It must be borne in mind that where, as here, the error asserted arises other than under the Constitution of the United States, *the defendant has the burden* of showing that the error was prejudicial and must do so by establishing "a reasonable possibility that, had the error in question not been committed, a

different result would have been reached at the trial . . . ." N.C.G.S. § 15A-1443(a) (1988). *See also State v. Spruill*, 320 N.C. 688, 360 S.E. 2d 667 (1987); *State v. DeLeonardo*, 315 N.C. 762, 340 S.E. 2d 350 (1986). The majority holds that the defendant has carried this burden. It bases this holding upon its conclusion that, had evidence of the statements by a witness the jury knew was a retarded child prostitute who admitted lying in the past not been introduced, there is a reasonable possibility the jury would have reached a different result. The majority is able to reach this conclusion only by baldly asserting that "the record reflects doubt about the testimony" of each of the disinterested eyewitnesses who testified that they saw the defendant and the victim together at about the time of the murder and, in the case of one eyewitness, while the murder was being committed.

In my view, a fair reading of the record reflects no such "doubt" concerning the testimony of the eyewitnesses. All of the eyewitnesses testified positively and unequivocally during both direct and cross-examination that the defendant was the man they saw at the times in question. Further, the record does not show that the eyewitnesses had any reason to be untruthful. It seems obvious that the jury—as any reasonable person would have— based its rejection of the defendant's alibi evidence upon the testimony of the disinterested eyewitnesses who observed the defendant and the victim together during the killing or near the time of its commission and not upon the State's "impeachment" evidence concerning the statements of the retarded child prostitute. The record does not support the conclusion that the jury would have reached a different result at trial, had the evidence of her prior statements not been admitted. Instead, it is clear to me on the record before us that any such conclusion is contrary to reason and common sense. Therefore, I dissent from the holding of the majority awarding this defendant a new trial.

Justice MEYER joins in this dissenting opinion.