UNPUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

DARRYL E. HUNT,
Petitioner-Appellant,

v.

MARTIN J. MCDADE, Correctional

No. 98-6808

Administrator, Harnett Correctional
Center; ATTORNEY GENERAL OF
NORTH CAROLINA,
Respondents-Appellees.

Appeal from the United States District Court
for the Middle District of North Carolina, at Winston-Salem.
Frank W. Bullock, Jr., District Judge.
(CA-96-350-6)

Argued: January 24, 2000

Decided: February 25, 2000

Before WILKINSON, Chief Judge, and LUTTIG and MOTZ,
Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** S. Mark Rabil, HOUGH & RABIL, Winston-Salem,
North Carolina, for Appellant. Clarence Joe DelForge, III, Assistant
Attorney General, NORTH CAROLINA DEPARTMENT OF JUS-
TICE, Raleigh, North Carolina, for Appellees. **ON BRIEF:** James E.

Ferguson, II, FERGUSON, STEIN, WALLAS, ADKINS, GRESHAM & SUMTER, P.A., Charlotte, North Carolina, for Appellant. Michael F. Easley, Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

After a jury convicted Darryl Eugene Hunt of first-degree murder and a state judge sentenced him to life imprisonment, Hunt filed a petition for federal habeas corpus relief under 28 U.S.C. § 2254. The district court dismissed the petition. For the reasons stated below, we affirm.

I.

The Supreme Court of North Carolina has set forth the facts of this case in detail. See State v. Hunt, 457 S.E.2d 276, 279-84 (N.C. 1994) (Hunt II). Accordingly, we only summarize them here.

Deborah Sykes left her home around 5:30 a.m. on the morning of October 10, 1984. She was found dead in a field near her place of employment at approximately 1:00 p.m. that same day. The medical evidence indicated that she had suffered multiple stab wounds and that she had been sexually assaulted both vaginally and anally.

Two different juries found Hunt guilty of murdering Mrs. Sykes. Hunt was first tried and convicted in 1984 and sentenced to life imprisonment. The North Carolina Supreme Court overturned the conviction on direct appeal, however, finding that the trial court had erroneously permitted a police officer to testify to the substance of

2

prior unsworn statements made by Hunt's girlfriend. See State v. Hunt, 378 S.E.2d 754, 760 (N.C. 1989) (Hunt I). Hunt was retried in 1990, and was again convicted of felony murder and sentenced to life imprisonment. This second conviction was upheld on direct appeal. See Hunt II, 457 S.E.2d at 279 (N.C. 1994). While Hunt's appeal from the second conviction was pending, he filed two motions for appropriate relief in state superior court requesting a new trial based on newly discovered DNA evidence and alleged Brady violations. See Brady v. Maryland, 373 U.S. 83 (1963). The North Carolina Supreme Court affirmed the superior court's denial of these motions. See Hunt II, 457 S.E.2d at 299.

During both of Hunt's trials, the state offered no direct evidence linking Hunt to the kidnaping, robbery, sexual assault, or murder of Mrs. Sykes. However, the state did offer substantial eyewitness testimony placing Hunt near the crime scene before, during, and after the murder.[1] Much of this testimony also indicated that Hunt was accompanied by Sammy Lee Mitchell, who was also indicted for the murder in 1990. Hunt's girlfriend, Margaret Marie Crawford, further implicated Hunt in the crimes, and the state also called two inmates who testified about incriminating statements Hunt made while he was in prison following his first conviction.

Hunt presented an alibi defense during his first trial. He and Mitchell testified that they had spent the night of August 9, 1984, at a friend's house and did not leave until after 7:00 a.m. the following morning. See Hunt I, 378 S.E.2d at 755. Their testimony was corroborated by three other witnesses. Id. During the second trial, the state's case-in-chief included the introduction of Hunt's first trial testimony. Hunt chose not to testify in the second trial, but he did call some of his own witnesses, including one who testified that he saw two men with Mrs. Sykes on the morning of the murder, and that Hunt was not one of them.

After exhausting his state remedies, Hunt filed a federal habeas petition under 28 U.S.C. § 2254 (1996). The district court adopted the magistrate judge's recommendations to grant the state's motion for

_____

[1] We discuss the testimony of certain witnesses at greater length in Part III infra.

summary judgment and to dismiss Hunt's petition. We granted a certificate of appealability on two issues. First, Hunt contends that he is actually innocent of murdering Mrs. Sykes or of committing any of the underlying offenses of kidnaping, robbery, or sexual assault. He bases his actual innocence claim on post-conviction DNA testing and requests a new trial in light of this evidence. Second, Hunt argues that the state failed to disclose exculpatory and impeachment evidence.

The parties dispute whether the amendments to § 2254, effected by the Antiterrorism and Effective Death Penalty Act of 1996, apply to Hunt's petition. Because we find the petition meritless even under the more lenient, pre-amendment standard of review, we assume without deciding that the Act does not apply for the purpose of this opinion. See, e.g., Beaver v. Thompson, 93 F.3d 1186, 1190 (4th Cir.), cert. denied, 519 U.S. 1021 (1996). We address each argument in turn.

II.

Hunt argues that he is factually innocent of felony murder because post-trial PCR/DNA testing[2] of a fluid sample taken from Mrs. Sykes' body indicates that he did not contribute the sperm found in the sample. Hunt asserts his innocence not as a procedural gateway to resurrect an otherwise defaulted claim, but rather as a freestanding actual innocence claim.

The procedural barriers to such a claim are familiar. See, e.g., Royal v. Taylor, 188 F.3d 239, 243 (4th Cir.), cert. denied, 120 S. Ct. 465 (1999). "Because federal habeas relief exists to correct constitutional defects, not factual errors, `[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.'" Id. (quoting Herrera v. Collins, 506 U.S. 390, 400 (1993)). Moreover, Hunt was not convicted of capital murder; he received a sentence of life imprisonment rather than the death penalty. The Herrera Court's analytical assumptions recognizing the possibility of a persuasive freestanding

_____

**2** As explained by the state superior court, "PCR (polymearase chain reaction) is a technique by which small amounts of DNA are replicated so DNA testing can be performed."

4

claim of actual innocence may be limited to capital cases because those assumptions were made in the context of evaluating the constitutionality of the petitioner's execution. 506 U.S. at 417; see also id. at 427 (O'Connor, J., concurring); id. at 429 (White, J., concurring in the judgment).

Even granting Hunt all necessary analytical assumptions to overcome the procedural bars imposed by Herrera, his claim that the PCR/DNA test results exonerate him of the murder of Mrs. Sykes cannot survive Herrera's stringent evidentiary standard. Herrera requires "a truly persuasive demonstration of `actual innocence,'" id. at 417, and states that "the threshold showing for . . . an assumed right [to assert a freestanding actual innocence claim] would necessarily be extraordinarily high." Id. "To be entitled to relief, . . . petitioner would at the very least be required to show that based on proffered newly discovered evidence and the entire record before the jury that convicted him, `no rational trier of fact could[find] proof of guilt beyond a reasonable doubt.'" Id. at 429. (White, J., concurring) (citing Jackson v. Virginia, 443 U.S. 307, 324 (1979)).

Hunt has made no such showing. If we evaluate the PCR/DNA test results along with the entirety of the evidence introduced at both trials, we are unable to conclude that no rational jury would have convicted Hunt of the murder. The new evidence is simply not sufficiently exculpatory to warrant a new trial. Indeed, as the magistrate judge explained, the DNA results do nothing to discount a number of other possible scenarios reasonably implicating Hunt in the sexual assault: Hunt's sperm might have been present on a different, untested sample; Hunt raped Mrs. Sykes but did not ejaculate; or Hunt sodomized Mrs. Sykes. Moreover, the DNA results do not exonerate Hunt from committing the murder, from committing the other underlying crimes of kidnaping or robbery, or from aiding and abetting any of these crimes, including the sexual assault.

In an attempt to deflect attention from these inevitable conclusions, however, Hunt belabors the fact that the DNA testing failed to match any of the state's three primary suspects--himself, Mitchell, and Johnny Gray--to the sperm found in one of the fluid samples takes from Mrs. Sykes' body. He argues that the DNA results substantially weaken the state's entire theory of the case, justifying a new trial, and

5

he relies on various cases in which a new trial was granted based on exculpatory DNA evidence. See, e.g., State v. Hammond, 604 A.2d 793 (Conn. 1992); State v. Hicks, 536 N.W.2d 487 (Wis. Ct. App. 1995), aff'd on other grounds, 549 N.W.2d 435 (Wis. 1996); Commonwealth v. Reese, 663 A.2d 206 (Pa. Super. Ct. 1995).

This argument fails to recognize that in both of Hunt's trials the state contended that there were multiple assailants involved in the crimes committed against Mrs. Sykes based on evidence related to the number and angle of the stab wounds and eyewitness testimony. Most of the cases Hunt cites involved victims who could attest that only one perpetrator committed the sexual assault. Therefore, DNA evidence that the defendant in each of those cases was not the one who contributed the sperm found in semen samples taken from the victim or her clothing established the requisite probability that a reasonable jury would not have returned a guilty verdict. The new evidence on which Hunt relies, when analyzed as part of the entire evidentiary record presented at trial, does not warrant a similar conclusion, particularly because the DNA results do nothing to exonerate Hunt of Mrs. Sykes' murder or of aiding and abetting the murder.

III.

We next address Hunt's claim that the state failed to disclose certain favorable evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). See also United States v. Bagley, 473 U.S. 667, 676 (1985) (explaining that Brady material includes both exculpatory and impeachment evidence). Brady holds that the favorable evidence must be material in order for its nondisclosure to violate due process and result in actual prejudice. 373 U.S. at 87. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley , 473 U.S. at 682; see also Kyles v. Whitley, 514 U.S. 419, 434 (1995). Within the materiality inquiry, a court should examine the undisclosed evidence item by item, and also consider the cumulative effect of all the suppressed evidence. See id. at 436-37.

Hunt first complains that the state failed to disclose the availability of alternative DNA testing methods. The state did disclose its labora-

6

tory's determination that the fluid samples taken from Mrs. Sykes' body were too degraded to be tested, but it did not disclose that the lab technician suggested calling someone in California to inquire about other testing possibilities. Hunt contends the failure to disclose the latter information constitutes a misrepresentation that allowed the state to frame certain testimony in a false light.

The district court properly concluded that Hunt is not entitled to the benefit of the Brady doctrine as to this information. Hunt had equal access to the fluid samples, and thus he was under an independent duty to pursue testing alternatives. See Barnes v. Thompson, 58 F.3d 971, 975 n.4 (4th Cir.) (noting that "Brady requires that the government disclose only evidence that is not available to the defense from other sources, either directly or through diligent investigation"), cert. denied, 516 U.S. 972 (1995); United States v. Wilson, 901 F.2d 378, 381 (4th Cir. 1990) (same). Moreover, the undisclosed information is arguably immaterial because the PCR/DNA testing method was not widely-accepted in 1990 and lacked validation studies and other documentary support, casting doubt on the admissibility of the testing results. See, e.g., Murray v. State, 692 So.2d 157, 160 n.5 (1997) (noting concern regarding the acceptability of PCR/DNA testing in the forensic setting as of 1992).

Hunt also contends that the state failed to disclose a substantial number of documents that would have further impeached many of the state witnesses. The difficulty with this argument is that it is not the amount of Brady material, but the specific substance of the material, that determines whether actual prejudice results from nondisclosure. We agree with the district court that the undisclosed impeachment evidence was cumulative and immaterial; as to most of the Brady claims, Hunt had access to equivalent or similar evidence during both trials for effective impeachment of witnesses on cross-examination.

Both the state superior court and the magistrate judge reviewed each item of suppressed evidence. In addition, although the Supreme Court did not issue its decision in Kyles v. Whitley until after the North Carolina court rendered its decision on Hunt's motions for appropriate relief, the magistrate judge explicitly applied Kyles' cumulative impact test in reviewing the Brady claims. We see no need to reconsider each item of undisclosed evidence here. We will, how-

7

ever, evaluate some of the suppressed information as it relates to the three state witnesses who provided the most compelling testimony implicating Hunt in the murder.

First, Johnny Gray testified that around 6:00 or 6:30 a.m. on August 10, 1984, he saw Hunt straddling the victim while hitting her in the chest and torso. Gray also testified that after he backed away from the scene, he turned around and saw Hunt tucking his shirt in his pants as he ran in the opposite direction. However, on August 22, 1984, Gray identified another person as Mrs. Sykes' assailant--an individual who had been incarcerated on the morning of the murder--and, when Gray viewed a lineup a few days later, he wrote down both Hunt's number and another number. Hunt used this evidence to impeach Gray's testimony at trial.

Hunt now contends that the state's failure to disclose a police report containing an inconsistent statement by Gray that the assailant's hair was not braided like Hunt's on the day of the murder, and other documents indicating that Gray had identified a different individual as the assailant, constitutes a Brady violation. The district court correctly determined that this material was cumulative to the impeachment evidence available to Hunt at trial. Most notably, Hunt possessed another of Gray's statements in which he expressed some uncertainty as to whether the assailant was black or white.

Another important state witness was Roger Weaver. Weaver had been working at the front desk of a hotel near the crime scene on the morning of the murder. Weaver observed Hunt on two separate occasions that morning. First, when he went to move his car between 4:30 and 5:00 a.m., Weaver saw Hunt and another black man standing on a corner near the hotel. Weaver recognized Hunt as the same person who had come into the hotel five or six times during the summer and asked to use the restroom. Weaver testified that a couple of hours later, at approximately 6:45 or 7:00 a.m., Hunt came into the hotel and went immediately to the restroom. Weaver eventually called a security guard because Hunt did not emerge from the restroom within a reasonable period of time, and Hunt immediately left when the guard entered. Weaver testified that he observed pinkish droplets in one of the sink basins and bloody paper towels in the trash.

8

On cross-examination during both trials, defense counsel asked Weaver a number of questions related to his inability to make a positive identification of Hunt during a photographic lineup. Weaver's testimony during the first trial reveals discrepancies in his description of Hunt's skin tone. During the second trial, Weaver admitted he was uncertain about the photographic identification. Thus, the state's failure to disclose a document containing an interview with Weaver in which he was unable to positively identify Hunt as a suspect from a photographic line-up in 1984 does not constitute a Brady violation because that information was cumulative.

The testimony of Marie Crawford, Hunt's girlfriend, further implicated him in the murder. At the time of the murder, Crawford was a fourteen-year-old prostitute. During Hunt's first trial, she denied having any knowledge about the murder of Mrs. Sykes. However, she had made certain unsworn, but signed, statements to the police regarding both Hunt and Mitchell's involvement in the underlying crimes and the murder. A police officer testified as to the substance of these unsworn statements, which served as the sole ground for the reversal of Hunt's first conviction. See Hunt I , 378 S.E.2d at 759-60 (finding that the state's use of Crawford's prior inconsistent statements was not for the primary purpose of impeaching her testimony, but rather to impermissibly corroborate the testimony of the police officer as to the facts averred by the prior statements, and that the probative value of the statements was substantially outweighed by the danger of unfair prejudice).

Crawford's testimony during the second trial, however, was largely consistent with her previous statements. According to Crawford, she awoke between 8:00 and 8:30 a.m. on the morning of the murder, and Hunt came to her motel room shortly thereafter. She testified that he had dirt and grass stains on the knees of his pants and that he washed what appeared to be blood from his hands. (Her previous statements did not mention the blood; this is the only way in which they materially differed from her testimony.) Hunt also seemed nervous and wanted to find Mitchell. Crawford then testified that while she and Hunt were watching a television program about the murder several days later, Hunt told her that he and Mitchell had tried to rob Mrs. Sykes, but that Mitchell raped Mrs. Sykes and "[s]he got killed." During her testimony at the second trial, Crawford also explained that she

9

did not tell the truth at the first trial because she was afraid that Mitchell would kill her.

Hunt contends that he could have further impeached Crawford's testimony if he had known that the police had paid her $10.00 after she made the unsworn statements incriminating him in the murder. The district court appropriately reasoned that in light of the other evidence Hunt used to attack Crawford's credibility at trial, the information as to the $10.00 payment was not material.

At oral argument before us, Hunt's counsel indicated that one of his strongest Brady claims related to Kevey Coleman's testimony. Coleman testified during the second trial that, despite not having his contacts in at the time, he saw a white female with two black men on the morning of the murder near the crime scene. Hunt maintains that the state disclosed only four of thirteen reports pertaining to Coleman. Hunt contends that Coleman's testimony "evolved" over time and points to September 1986 interview notes in which Coleman stated he could not make a positive identification of any kind. Hunt also identifies a suppressed document in which Coleman's girlfriend, Paula Monroe, stated that the police both threatened Coleman and offered him a bribe.

As with other witnesses, Hunt had ample impeachment evidence as to Coleman's testimony, including his inability to make a positive photo identification of Hunt or Mitchell--indeed, Coleman himself testified to this fact at trial. Hunt also presented to the jury the testimony of Talmadge Campbell regarding the possibility that Coleman received a bribe in exchange for his testimony. Thus, the undisclosed evidence was mostly cumulative and would have had only limited impeachment value at trial.

In sum, Hunt had a substantial amount of impeachment evidence available to him during both trials, evidence he used extensively in cross-examining witnesses. The information the state failed to disclose to him was cumulative, immaterial, or both. Thus, Hunt cannot demonstrate that he suffered actual prejudice from its nondisclosure.

10

IV.

For the foregoing reasons, the district court's dismissal of Hunt's habeas petition is

AFFIRMED.

11