STATE OF NORTH CAROLINA v. DARRYL EUGENE HUNT[1]

No. 17A91

(Filed 30 December 1994

Mandate 2 March 1995)

### 1. Constitutional Law § 352 (NCI4th)— first-degree murder— retrial—use of defendant's testimony from first trial

The trial court did not err in a noncapital first-degree murder prosecution by allowing the admission of defendant's testimony from the first trial where defendant contended that he was induced to testify at the first trial by the improper use of another witness's prior statements. Defendant's first trial testimony was primarily given to establish an alibi at the time of the murder in contradiction to the evidence presented by the prosecution, which was later held inadmissible upon evidentiary rather than constitutional grounds, and defendant has failed to show that he was compelled to testify due to the admission of any unconstitutionally obtained evidence. As in *State v. Farrell*, 223 N.C. 804, the defendant offered himself as a witness at the former trial for the purpose of having the jury consider his testimony in determining his guilt or innocence and what he said then may be used at any subsequent stage of the prosecution.

**Am Jur 2d, Criminal Law §§ 701 et seq., 936 et seq.**

**Use in subsequent prosecution of self-incriminating testimony given without invoking privilege. 5 ALR2d 1404.**

### 2. Appeal and Error § 147 (NCI4th)— first-degree murder— retrial—use of defendant's prior testimony—mention of prior conviction—failure to object

A first-degree murder defendant being retried waived his right to assign error to his testimony from his first trial regarding a prior conviction where defendant objected to the introduction of the portion of his first trial testimony referring to a misdemeanor conviction for contributing to the delinquency of a minor, the trial court told defense counsel that the "best way to [object] . . . is to object as each question may be asked that you perceive

---

1. This opinion was originally filed on 30 December 1994. Upon motion by defendant for reconsideration, the mandate was temporarily stayed 19 January 1995 pending further orders of the Court. Defendant's motion for reconsideration was denied 2 March 1995.

is objectionable," and there were no specific objections to the questions concerning the plea, although defense counsel did object to the reading of certain other portions of the transcript.

**Am Jur 2d, Appeal and Error §§ 545 et seq.**

3. **Criminal Law § 425 (NCI4th)— first-degree murder—retrial—prosecutor's argument—alibi from first trial—defendant's failure to call witnesses at second trial—no error**

The trial court did not err in a first-degree murder retrial by overruling defendant's objections to the prosecutor's arguments that defendant did not call alibi witnesses to prove his alibi from the first trial and did not introduce a photograph which he had testified was taken on the night of the murder. Although a prosecutor may not comment on the failure of a defendant to testify at trial, it is permissible for the prosecutor to point out to the jury that the defendant has produced no exculpatory evidence and has contradicted no evidence presented by the State. In this case, the prosecutor merely argued that the jury could consider the fact that defendant did not call any alibi witnesses or introduce a photograph exculpating himself.

**Am Jur 2d, Trial §§ 577 et seq., 590 et seq.**

**Comment or argument by court or counsel that prosecution evidence is uncontradicted as amounting to improper reference to accused's failure to testify. 14 ALR3d 723.**

4. **Criminal Law § 427 (NCI4th)— first-degree murder—retrial—prosecutor's closing argument—defendant's decision not to testify**

There was no plain error in a first-degree murder retrial where the court did not intervene *ex mero motu* to stop the prosecutor from commenting on defendant's decision not to testify where defendant himself argued that the State put on defendant's testimony from a prior trial and stated that the defense decided not to have defendant testify further and that defendant's silence was not to influence the trial.

**Am Jur 2d, Trial §§ 577 et seq.**

**Violation of federal constitutional rule (*Griffin v. California*) prohibiting adverse comment by prosecutor or court upon accused's failure to testify, as constituting reversible or harmless error. 24 ALR3d 1093.**

STATE v. HUNT

[339 N.C. 622 (1995)]

### 5. Criminal Law § 757 (NCI4th)— first-degree murder—retrial—instructions—reasonable doubt—no error

The trial court did not err during a first-degree murder retrial by not giving the Pattern Jury Instruction on reasonable doubt as requested by defendant. The instructions given by the court adequately reflected the substance of defendant's requested instructions, the reasonable doubt instruction given by the trial judge was not constitutionally deficient, and the trial judge did not err in refusing to give defendant's requested instructions verbatim.

**Am Jur 2d, Trial § 1374.**

### 6. Evidence and Witnesses § 982 (NCI4th)— first-degree murder—retrial—prior testimony of witness now taking Fifth—admissible

There was no error in a first-degree murder retrial where a witness who had testified at the first trial had subsequently been indicted and refused to answer questions based upon the Fifth Amendment and the witness's testimony at the first trial was admitted. Although defendant contends that the witness was an alibi witness at the first trial and that defendant did not have a similar motive for questioning the witness during the second trial, there was no reasonable showing that the motive would have been different. That motive was to seek the facts favorable to defendant regarding defendant's whereabouts at the time of the crime and defense counsel had ample opportunity to develop this testimony. N.C.G.S. § 8C-1, Rule 804(b)(1).

**Am Jur 2d, Evidence §§ 890 et seq.; Homicide §§ 393, 394.**

**Witness' refusal to testify on ground of self-incrimination as justifying reception of evidence of prior statements or admissions. 43 ALR3d 1413.**

### 7. Evidence and Witnesses § 472 (NCI4th)— first-degree murder—in-court identification of defendant—illegal lineup

The trial court did not err in a first-degree murder retrial by admitting identification testimony, notwithstanding alleged defects or irregularities in the lineup procedure, from a hotel auditor who stated during *voir dire* that he had observed defendant on the morning of 10 August (the morning on which the murder occurred) and that they had eye contact at least three times on that morning; that he had seen defendant on at least five or six

prior occasions in the hotel lobby and that he and defendant usually had brief conversations when defendant came into the hotel to use the rest room; the witness never identified anyone other than defendant; and the witness stated numerous times that the lobby was well lit and that nothing was obstructing his view of defendant when he came into the hotel. Considering the totality of the circumstances, the witness's ability to identify defendant as the person he saw in the hotel on the morning of 10 August was not the product of the illegal lineup but originated independently.

**Am Jur 2d, Evidence § 628.**

**Admissibility of evidence of lineup identification as affected by allegedly suggestive lineup procedures. 39 ALR3d 487.**

8. **Criminal Law § 793 (NCI4th)— first-degree murder— instructions—acting in concert and aiding and abetting— actual presence at scene**

There was no plain error in a first-degree murder retrial by failing to instruct the jury that defendant's active or constructive presence at the scene of the crime is an essential element of the theories of acting in concert and aiding and abetting. The instruction on acting in concert given by the trial judge was taken from the Pattern Jury Instructions; moreover, it is well settled that a charge on presence at the scene of the crime is unnecessary in a case in which the evidence shows that the defendant was actually present at the time the crime was committed.

**Am Jur 2d, Trial §§ 1255 et seq.**

9. **Criminal Law §§ 446, 447 (NCI4th)— first-degree murder— prosecutor's argument—impact on victim and family— sending message—no plain error**

There was no plain error in a first-degree murder retrial where the trial court did not intervene *ex mero motu* to stop what defendant contends was an overly emotional appeal to the jury during the prosecutor's closing argument. An argument concerning a murder victim's thoughts and the experience of the family of the loss were not grossly improper, it has been held that the prosecutor's remarks that the jury acts as the voice and conscience of the community are permissible, and the prosecutor's closing statements regarding the victim and the pain she experienced

were based upon the medical evidence presented at trial and thus were properly admitted.

**Am Jur 2d, Trial §§ 648 et seq., 664 et seq.**

**Propriety and prejudicial effect of prosecutor's remarks as to victim's age, family circumstances, or the like. 50 ALR3d 8.**

10. **Evidence and Witnesses § 969 (NCI4th)— first-degree murder—municipal report on investigation—not admissible**

The trial court did not err in a first-degree murder retrial by refusing to admit factual findings contained in a report by the city manager of a review of the investigation conducted after the first trial. Although defendant contends that the report was admissible pursuant to N.C.G.S. § 8C-1, Rule 803(8)(c), the report was not the result of "authority granted by law" to conduct an investigation into the murder, there was no assurance that the report contained factual findings that would be admissible, the report was not prepared for the purpose of being introduced against the State in a criminal case, and the prosecution did not have an opportunity to cross-examine the persons interviewed for the report.

**Am Jur 2d, Evidence §§ 1363 et seq.**

**Admissibility, under Rule 803(8)(C) of Federal Rules of Evidence, of "factual findings resulting from investigation made pursuant to authority granted by law." 47 ALR Fed. 321.**

11. **Criminal Law § 107 (NCI4th)— first-degree murder—retrial—investigation following first trial—SBI report not admitted**

The trial court did not err in a first-degree murder retrial by denying defendant's motion for an *in camera* inspection of an SBI investigative file prepared after the first trial. Because the prosecutor provided defense counsel with prior statements made by the prosecution's witnesses after they testified on direct examination, the trial court was not required to conduct its own *in camera* review. Moreover, defendant has failed to establish that any evidence not disclosed from the SBI report was "material" and what effect, if any, the nondisclosure would have had on the outcome of the trial.

**Am Jur 2d, Depositions and Discovery § 443.**

**Right of defendant in criminal case to inspection of statement of prosecution's witness for purposes of cross-examination or impeachment. 7 ALR3d 181.**

12. **Evidence and Witnesses § 2973 (NCI4th)— first-degree murder—impeachment of witness—cross-examination concerning prior false testimony—not allowed—no prejudicial error**

There was no prejudicial error in a first-degree murder retrial where the court prohibited defendant from impeaching the testimony of a prosecution witness regarding a lawsuit in which he had made false accusations. Assuming that there was error in the exclusion of the evidence, there is no reasonable possibility that the outcome of the trial would have been different if the evidence had been admitted.

**Am Jur 2d, Witnesses §§ 563 et seq.**

13. **Evidence and Witnesses § 2974 (NCI4th)— first-degree murder—prosecution witness—reputation for truthfulness**

The trial court did not err in a first-degree murder retrial by excluding testimony by a defense witness about the basis for his opinion about the untruthfulness of his brother, a prosecution witness. N.C.G.S. § 8C-1, Rule 404(a) is not applicable because the witness's responses do not relate to specific instances of conduct; moreover, N.C.G.S. § 8C-1, Rule 608(a) pertains solely to reputation or opinion testimony and this evidence was not in the form of reputation or opinion contemplated by Rule 608(a).

**Am Jur 2d, Witnesses §§ 563 et seq.**

**Construction and application of Rule 608(b) of Federal Rules of Evidence dealing with use of specific instances of conduct to attack or support credibility. 36 ALR Fed. 564.**

14. **Criminal Law § 1013 (NCI4th)— first-degree murder— motion for appropriate relief—DNA evidence**

Motions for appropriate relief in the trial and appellate divisions in a first-degree murder retrial were denied.

**Am Jur 2d, New Trial §§ 164 et seq.**

STATE v. HUNT

[339 N.C. 622 (1995)]

Justice FRYE dissenting.

Chief Justice EXUM joins in this dissenting opinion.

Justice WEBB joins in this dissenting opinion.

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Ferrell, J., at the 17 September 1990 Criminal Session of Superior Court, Catawba County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 17 February 1993.

*Michael F. Easley, Attorney General, by Steven F. Bryant, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Benjamin Sendor, Assistant Appellate Defender, for defendant-appellant.*

MEYER, Justice.

On 10 December 1984, defendant was indicted for first-degree murder in the death of Deborah Brotherton Sykes. At defendant's first trial, the jury returned a verdict of guilty of first-degree felony murder, and defendant was sentenced to life imprisonment. On appeal, this Court found error in the guilt phase of defendant's trial, reversed the conviction, and ordered a new trial. *State v. Hunt*, 324 N.C. 343, 378 S.E.2d 754 (1989) (hereinafter *Hunt I*). On 27 July 1990, the trial judge entered an order changing the venue of the retrial to Catawba County because of extensive media coverage. At his new trial, defendant was retried noncapitally, and the jury returned a verdict of guilty of first-degree felony murder. The trial court subsequently imposed the mandatory sentence of life imprisonment. N.C.G.S. § 14-17 (Supp. 1992).

On appeal, defendant brings forth numerous assignments of error. After a thorough review of the transcript of the proceedings, record on appeal, briefs, and oral arguments, we conclude that defendant received a fair trial free of prejudicial error, and we therefore affirm his conviction and sentence.

Evidence presented at the trial tended to show the following: In 1984, Deborah Sykes was living in Mooresville, North Carolina, with her husband, John Sykes, at the home of his parents. In the summer of 1984, Mrs. Sykes was employed as a copy editor for the *Winston-*

STATE v. HUNT

[339 N.C. 622 (1995)]

*Salem Sentinel.* She would routinely leave home around 5:30 a.m. and arrive at work at approximately 6:30 a.m. Normally, Mrs. Sykes parked her car on a side street near the Crystal Towers apartments, approximately two blocks from the newspaper office.

On 10 August 1984, Mrs. Sykes left for work wearing a white sweater, a top under the sweater, and blue slacks. On this particular day, she was carrying two to three hundred dollars in a purse inside her pocketbook. At 7:00 or 7:30 a.m., Mrs. Sykes' supervisor telephoned Mr. Sykes to report that his wife had not arrived at work. Later that morning, when Mr. Sykes learned that Mrs. Sykes still had not arrived, he drove to Winston-Salem to look for her. Upon arriving in Winston-Salem around 10:00 a.m., Mr. Sykes immediately drove to the street where Mrs. Sykes usually parked. He found her car parked on West End Boulevard. Mr. Sykes then walked to the *Sentinel* office, and the police were called.

On 10 August 1984 at approximately 1:00 p.m., Brian Watts, an employee for Adele Knits, was walking through a field behind Crystal Towers. As he walked around the corner of some bushes, Watts observed a pocketbook. Beside the pocketbook, Watts noticed some change on the ground. Near the bushes was a fence made of posts sticking in the ground side by side. Next to the fence were a woman's sweater and a woman's pair of shoes. Watts picked up the pocketbook but found only change inside. After placing the pocketbook back on the ground, Watts walked around a corner of the fence, where he observed the body of a white female lying on a hill. The body was clothed only in "something like a tube top" and in panties that were torn. The woman appeared to be dead. Watts walked back to the street, where he saw two police officers and reported what he had seen. Watts then led the officers to the body.

At approximately 2:00 p.m. on Friday, 10 August 1984, Vickie Pearl, an identification technician with the Winston-Salem Police Department arrived at the crime scene behind Crystal Towers. Pearl observed Mrs. Sykes' body lying on a grassy slope in the field near West End Boulevard. Nearby she saw a pair of navy blue pants, a purse, a white sweater, a pair of multi-colored sandals, and a piece of beige elastic. The zipper on the pants was torn, and one pants leg was turned inside out and had dirt and debris on it. Pearl saw what appeared to be blood on the grass near the victim's body. The victim had on a beige knit short-sleeve top, a brassiere with a broken clasp, and beige underpants. There were bloodstains on her legs and

wounds on the front and back of her torso. Her body was found twenty to thirty feet from West End Boulevard on the side of the fence away from the street.

At approximately 2:15 p.m. on the same day, Dr. Lew Stringer, the medical examiner of Forsyth County, responded to a call on West End Boulevard. Upon arriving at the scene, Dr. Stringer also observed a pair of shoes, a pocketbook, and a sweater next to the fence posts. Just around the corner, he observed the pants with the leg turned inside out. In the area where the pants were located, there appeared to be a lot of bent grass, indicating that there had been a struggle in that location. From the area where the pants were found, down to the location of the body, the grass was bent over and blood was observed, especially near the body. Describing the body, Dr. Stringer stated that the victim was lying partly on her right side. Dr. Stringer saw multiple puncture or stab wounds on the victim, including in the neck, the side, the chest, and the back. The victim's underpants were pulled up to her chest, and the crotch had been either cut or torn away. The victim's blouse was pulled up, and one shoulder of the blouse was pulled down. There was blood on the victim's legs from the thighs to just below the knees. In Dr. Stringer's opinion, the wounds to the chest and neck were caused by a small pocket-size knife. From the nature of the wounds, Dr. Stringer opined that it appeared that at least some of the stab wounds were inflicted while the victim was either standing or kneeling. Dr. Stringer noted that the violent assault probably occurred over a period of time and that the victim probably endured much pain and suffering.

On 11 August 1984, Dr. Michael Shkrum, a pathologist with the North Carolina Medical Examiner's Office, performed an autopsy on the body of Deborah Sykes. The victim was a white female, age twenty-six. She was five-feet ten inches tall and weighed approximately 145 pounds. Mrs. Sykes was clothed in a white sleeveless blouse with five holes in the front, a brassiere with a broken clasp, and a pair of panties that were pulled up to her mid-abdomen area and that had been cut or torn. Dr. Shkrum observed four stab wounds to the chest as well as several wounds to the neck. There were two slash wounds under the victim's left chin, along with several superficial slash wounds. Dr. Shkrum found one rib fractured and a wound to the back of the head and upper back. On the left side of the upper back were three more large wounds and several superficial wounds. There was a slash wound to the left wrist consistent with a defensive wound. In Dr. Shkrum's opinion, the cause of death was a stab wound

to the victim's chest. Describing the fatal wound, Dr. Shkrum noted that the knife entered the sack around the heart. There was also an entry wound to the left side of the heart, and about a quart of blood had flowed into the chest cavity.

Furthermore, in Dr. Shkrum's opinion, the victim had been sexually assaulted. There was fluid found in the vagina and around the anus. Sperm was present in both samples. Based on Dr. Shkrum's examination, the time of death could have been between 6:00 a.m. and 7:00 a.m. on 10 August 1984.

Roger Stamey, a licensed bondsman, testified that around 2:00 a.m. on 10 August 1984, he and Billy Revis were looking for "bond skips" in the area of Ninth and Chestnut Streets in Winston-Salem, about a ten-minute walk from the crime scene. While in front of Service Distributors, Stamey saw the defendant, Sammy Mitchell, Marie Crawford, and a woman named Ann standing across the street. Mitchell walked across the street and talked to Stamey and Revis. After a brief conversation, Mitchell returned to where the others were standing, and the four continued walking up the street in the direction of downtown. At approximately 2:30 a.m., Stamey and Revis got into their car and proceeded towards downtown. They passed defendant, Mitchell, and the two women, who were standing on the corner of Seventh and Liberty Streets, approximately three blocks from the crime scene.

Roger S. Weaver, an auditor at the front desk for the Hyatt House Hotel in Winston-Salem, testified that he was working in the early morning hours of 10 August 1984. Between 4:30 a.m. and 5:00 a.m., Weaver went outside to move his car from the parking deck and observed two black men standing at a corner near the hotel. Weaver recognized one of the men from having seen him previously in the hotel. Weaver then noticed that the two men began walking in the direction of Crystal Towers. After Weaver parked his car, he re-entered the hotel and went to the rest room in the lobby. Weaver did not notice anything unusual in the rest room at that time.

At approximately 6:45 or 7:00 a.m. on the same day, Weaver saw a black man enter the hotel. Once inside the hotel, the man made eye contact with Weaver. Weaver recognized the man as the same person who had come into the hotel five or six times during the summer. Weaver stated that the man had come in during the early morning hours and had asked to use the rest room. On these other occasions, Weaver had brief conversations with the man and had given him per-

mission to use the rest room. Weaver identified the man who came into the Hyatt House Hotel on 10 August 1984 as the defendant. On this particular morning, defendant did not ask to use the rest room, but instead headed directly towards the rest room. On his way to the rest room, defendant turned around and again looked directly at Weaver. While defendant was inside the rest room, no one else entered the rest room. Because defendant remained in the rest room longer than usual, Weaver instructed the security guard, Danny Holt, to go into the rest room and check on defendant. Once Holt entered the rest room, defendant left immediately. As defendant was leaving the hotel, Weaver noted that defendant was one of the two men that he had seen earlier that morning when moving his car. Weaver also identified Sammy Mitchell as the second black male.

At approximately 7:10 a.m., Weaver's replacement arrived at the front desk. Before leaving his shift, Weaver went to the rest room. Since defendant had left the hotel, no one else had entered the rest room. Once inside the rest room, Weaver noticed that the water in one of the sink basins was pink, colored by what appeared to be blood. After washing his hands, Weaver observed bloody paper towels in the wastepaper dispenser. Returning to the front desk, Weaver got his jacket and left the hotel.

Debra Davis testified that sometime between 6:30 a.m. and 7:30 a.m. on 10 August 1984, she was driving her car through downtown Winston-Salem with her husband. She was on her way to work when she passed by the Crystal Towers. While driving down Sixth Street, Davis testified that she saw defendant and Sammy Mitchell walking together about sixty feet from her. Davis had met defendant once before and had seen him with Mitchell several times.

Kevey Coleman was working the night shift at a Coca-Cola facility in Winston-Salem in 1984. Coleman testified that on 10 August 1984, he left work at 6:00 a.m. and got a ride home with a co-worker. Coleman was dropped off at Cherry and Sixth Streets and walked towards his home. At about 6:15 a.m., Coleman saw a woman, whom he later identified as Deborah Sykes, and two black men walking across an intersection. When Coleman first saw the three people, they were walking in his direction, but they then turned around and started walking in the other direction. One man, who was heavy-set and had a beard, had his arm around the woman's waist, and the other man, who appeared to have braids in his hair, was a step behind them. Coleman testified that the sight of the three people "just didn't look

right" because the woman's clothes were neat and the two men's clothes were dirty. Coleman was approximately forty feet away from them. When Coleman reached his front porch, he heard a loud scream. He looked in the direction of the scream but did not see anything. He then entered his house. Coleman testified that one of the two men with Sykes looked like defendant, although Coleman testified that he did not have his contact lenses in when he observed this incident.

On 10 August 1984, Bobby Upchurch was working at Herring Decorating with Ralph Nash. They usually walked down West End Boulevard to work around 6:30 a.m. Both men testified that they were traveling this route on 10 August at approximately 6:20 a.m. when they noticed a black male and a white female. The male had his arm around the female's waist. The male and female walked in front of Upchurch and Nash. Upchurch noticed that the woman was trying to pull away from the man. As Upchurch watched, he saw the black male take his leg and trip the white female. The woman fell down flat on her back. The man then put the woman's hands above her head, pinned her arms down, and straddled her. Upchurch and Nash walked on by. Upchurch and Nash testified that they often saw people in that area arguing about liquor, and Nash thought the two people were "winos."

Thomas Murphy lived in Winston-Salem in 1984 and worked for Hanes Dye and Finishing Company. Murphy testified that on 10 August 1984 at approximately 6:20 a.m., he was sitting at the intersection of Fifth Street and West End Boulevard near the Crystal Towers area, when he saw a black man and a white woman. He also saw another black man in the bushes nearby. The first man was holding the woman's right arm with one hand and had his other arm around the woman's neck in such a manner that her head was against his head. The woman was standing still, hands hanging down. Her eyes were closed. Murphy identified defendant as the man holding the woman and identified the man in the bushes as Johnny Gray. From a photograph of the victim, Murphy identified Deborah Sykes as the woman he had seen with defendant. After Murphy saw the three people, he assumed they were drunks and continued to drive to work. After seeing a television news bulletin around 4:00 p.m that same day, Murphy called the police department to report what he had seen.

Edward Reece testified that around 7:00 a.m. on the morning in question, he was driving on West End Boulevard to Herring Decorat-

ing, where he worked as a foreman. While passing near the Crystal Towers, Reece saw Sammy Mitchell coming out of a driveway, walking at a very fast pace. Reece had known Mitchell for approximately fifteen years. As Reece passed by, he called out to Mitchell and asked him what he was doing. Mitchell did not respond. At the time, Mitchell was alone.

Johnny Gray testified that on the morning of 10 August 1984 around 6:30 a.m., he got off the bus in downtown Winston-Salem between Fourth and Fifth Streets. He went to a coffee shop for about five minutes and then walked towards the house of a friend, Mark Brunson, to pick up some laundry. His route to Brunson's house took him near Crystal Towers and along West End Boulevard. As he walked by Crystal Towers, Gray heard a woman scream at least three times. He crossed the street toward the source of the scream. Forty to fifty feet away, on the other side of a post fence, Gray observed a black male on top of a white female. Gray saw the man straddling the woman and pinning her arms down while hitting her in the torso. Gray noticed that the woman had no clothes on from the waist down. Gray could not see whether the man had anything in his hands, but he could tell that the blows were being inflicted to the woman's chest. As Gray watched, the man turned, and Gray was able to see his face. Gray identified the man as the defendant. He noted that the defendant had "braided" hair. Defendant continued to beat the woman. At this point, Gray backed away and started walking down the sidewalk. As he left the scene, Gray heard the woman screaming. Gray looked back and saw the woman on her knees. Gray observed defendant tucking his shirt in his pants and running in the opposite direction. Looking back at the woman, Gray saw her drop her head and just roll over on her back. After the woman fell over, Gray did not hear any more screams.

At exactly 6:53 a.m., Gray stopped at a telephone booth near the Black Velvet Lounge on Thurman Street and telephoned the police. Gray untruthfully told the dispatcher that his name was Sammy Mitchell and that he wanted to report a man beating a woman in a field behind Crystal Towers, close to the fire station. After making the 911 call, Gray continued to Brunson's house, arriving between 7:00 a.m. and 7:30 a.m. Gray told Brunson that he had seen a man beating a woman. On 13 August 1984, three days after the murder, a police officer stopped Gray close to the scene of the crime and asked him his name and whether he had heard anything about the crime. Gray identified himself as Johnny Gray and told the officer that he did not

know anything about the murder; he did not tell the officer that he was the 911 caller.

On 22 August 1984, Gray telephoned the police and identified himself as the 911 caller. Gray told the police that he had seen the assailant that day and described the clothing that the man had on when he saw him. Gray later went down to the police station to identify the assailant. The police asked Gray to look at a person in the station room to see whether he was the assailant. Gray went by the room, looked through the open door, and looked the man in the face. Gray identified the man in the room "a couple of times" as Sykes' assailant. The man Gray identified as the assailant was Terry Thomas, who was later found to have been incarcerated on the morning of 10 August 1984.

A couple of weeks after the murder, Gray viewed a lineup at the Forsyth County jail. Officer J.I. Daulton told Gray that if he saw the assailant in the lineup, he should write the suspect's number on a piece of paper. Gray wrote down two numbers after viewing the lineup: one and four. Defendant wore number four in the lineup. Gray testified that he wrote the numbers "one" and "four" because the "number one suspect was number four."

Margaret Marie Crawford testified that in August of 1984, she was fourteen years old and living in Winston-Salem working as a prostitute. During the summer of 1984, Crawford met defendant. On the evening of 9 August 1984, Crawford, defendant, Sammy Mitchell, and Ann Wilson were standing on the corner of Ninth and Patterson Streets. Later that night, Crawford went back to her room at Motel 6 and went to sleep. She testified that defendant came to her room in the early morning hours of 10 August 1984, but she did not recall the time. When Crawford awoke at 8:00 or 8:30 a.m., she found that defendant was not in the room. A short time later, as she was getting ready to leave, defendant returned to the room. Crawford observed that defendant had dirt and grass stains on the knees of his pants. Defendant began washing what appeared to be blood off of his hands. Defendant seemed "nervous" and stated that he wanted to go see Mitchell. Defendant and Crawford rode in a cab to Mitchell's mother's house. After defendant changed clothes, he and Crawford went to the courthouse to meet Sammy Mitchell, who had to be in court on that day.

Crawford testified that several days later, she and defendant were watching television. While watching a show called "Crimestoppers,"

they heard about a reward for information on the Deborah Sykes murder. Crawford exclaimed that she wished she knew who killed Sykes. In response, defendant stated, "Sammy did it and he f——ed her, too." Defendant told Crawford that he and Mitchell were "just trying to rob her" and "[s]he got killed."

Crawford testified that during defendant's first trial, she denied signing certain statements for the police in 1984 because she was afraid. Crawford admitted that during the first trial, she said that she knew nothing about the murder of Deborah Sykes and that defendant would not have committed a crime like murder. Crawford said that she had always been afraid of Sammy Mitchell and that before the first trial, she received several letters that appeared to be from Mitchell threatening to kill her if she testified.

William C. Hooper testified that he worked for Hanes Dye and Finishing Company in Winston-Salem in 1984. Hooper testified that on 10 August 1984, just before 6:40 a.m., while he was driving down West End Boulevard near Crystal Towers, he observed two black men and a white woman on the sidewalk. He saw the shorter man shake his finger in the woman's face. Hooper then saw the taller man kiss the woman on the lips, and he assumed that they had just been out all night. Hooper later told police officers and the district attorney that defendant was not either of the two men that he had seen.

Additional facts will be discussed as necessary for the proper disposition of the issues raised by defendant.·

[1] Defendant assigns error to the admission, over his objection, of defendant's testimony from the first trial, read into evidence by the court reporter from the first trial. Defendant argues that *Harrison v. United States*, 392 U.S. 219, 20 L. Ed. 2d 1047 (1968), bars the State's introduction of defendant's first trial testimony because it was the improper use of Marie Crawford's prior statements that induced defendant to testify during the first trial, thus violating his privilege against self-incrimination. We disagree.

In order to analyze this issue, it is necessary to briefly examine this Court's decision in *Hunt I*. In *Hunt I*, the State introduced evidence of prior statements allegedly made by Marie Crawford that tended to incriminate defendant. Crawford first denied that she had made the statements, then stated that she could not recall having given the prosecutor or the police detective a statement. After *voir dire* of Crawford, the trial court ruled that because the witness may

have been hostile or unwilling, it was proper for the State to cross-examine Crawford regarding the alleged statements and that the relevance and probative value of Crawford's testimony would substantially outweigh any danger of unfair prejudice or confusion. Prior to the introduction of the statements into evidence during direct examination of Crawford, the trial court instructed the jurors that they were to consider Crawford's prior unsworn statements for the limited purpose of later determining Officer Daulton's credibility. These statements were reintroduced through the testimony of the police detective, Officer Daulton, to whom they had been made. The trial court allowed the introduction of both statements into evidence during direct examination of Daulton without a limiting instruction. In its final charge to the jury, the trial court instructed the jurors that Crawford's prior statements could be considered by them in determining the credibility of the witness. However, in recapitulating the testimony of Officer Daulton, the court reiterated the substance of both statements.

In *Hunt I*, this Court held that "the trial court erred in permitting Officer Daulton to testify as to the substance of the prior statements denied by [Crawford]." *Hunt I*, 324 N.C. at 348, 378 S.E.2d at 757. We found that it was improper to impeach Crawford concerning what she had or had not told Officer Daulton by offering Officer Daulton's testimony. *Id.* at 349, 378 S.E.2d at 757. This Court found that the proper use of the prior statements to corroborate Officer Daulton's testimony would have been only to demonstrate the fact that Crawford made statements to him on a particular date, not to prove the facts those statements purported to relate. *Id.* at 352, 378 S.E.2d at 759. The fact that the jury might confuse the substance of the statements with their use for the purpose of impeachment was compounded by the nature of the trial court's limiting instructions. *Id.* at 351, 378 S.E.2d at 759.

In *Harrison*, the Supreme Court reversed the defendant's conviction for murder where it was shown that at defendant's first trial, the prosecution introduced three confessions allegedly made by the defendant while he was in the custody of police. 392 U.S. at 220, 20 L. Ed. 2d at 1050. After these confessions had been admitted into evidence, the defendant testified in his own behalf to the events leading up to the victim's death. *Id.* At defendant's first trial, the jury found defendant guilty, and on appeal, the Court of Appeals reversed defendant's conviction, holding that the three confessions were obtained illegally and thus were inadmissible in evidence against defendant. *Harrison v. United States*, 359 F.2d 214, 222, *reh'g en*

*banc,* 359 F.2d 223 (D.C. Cir. 1965). Following the appeal, defendant was again tried for murder. At the second trial, the prosecution offered into evidence defendant's first trial testimony which placed him at the scene with the murder weapon. *Harrison,* 392 U.S. at 220, 20 L. Ed. 2d at 1050. The United States Supreme Court reasoned that, based on these facts, the prosecution could not introduce evidence of defendant's admissions at an earlier trial of the same case if defendant's taking the stand was clearly compelled by the State's introduction of illegally obtained confessions by him. *Id.* The Court held that because defendant was forced to testify in the earlier case to respond to the illegally obtained confessions, his compelled testimony in that case violated his Fifth Amendment right against self-incrimination. *Id.* However, the Court specifically noted:

> In this case we need not and do not question the general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings. A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him.

*Id.* at 222, 20 L. Ed. 2d at 1051.

In *State v. Wills,* 293 N.C. 546, 240 S.E.2d 328 (1977), this Court found that *Harrison* is limited to situations in which a defendant's testimony during a first trial is induced by constitutionally inadmissible evidence, not by the strength of the State's case. *Id.* at 550, 240 S.E.2d at 330-31. Even if defendant's testimony at his first trial was induced by evidence which was inadmissible under the rules of evidence, and not because it was unconstitutionally obtained, the *Harrison* exception to the general rule permitting the testimony to be offered at the second trial would not apply. *Id.; State v. Castonguay,* 218 Conn. 486, 491, 590 A.2d 901, 904 (1991); *United States v. Mortensen,* 860 F.2d 948, 951 (9th Cir. 1988), *cert. denied,* 490 U.S. 1036, 104 L. Ed. 2d 406 (1989); *People v. Armentero,* 148 Mich. App. 120, 384 N.W.2d 98 (1986), *denial of post-conviction relief reversed,* 194 Mich. App. 540, 487 N.W.2d 813 (1992), *appeal denied,* 441 Mich. 931, 498 N.W.2d 737, *reconsideration denied,* 502 N.W.2d 42 (1993). Therefore, we find that *Harrison* is inapplicable to the case at bar.

Although defendant did not testify in the second trial, the court reporter from the first trial read the transcript of his testimony from that trial. During the first trial, defendant testified that on the evening of 9 August 1984, he went to some liquor houses and then went to Cynthia McKeys' house at 1905 Dunleith Road in Winston-Salem. Sammy Mitchell was also at Cynthia McKeys' house. Defendant said that he was intoxicated when he went to sleep at 11:00 or 11:30 p.m. Defendant stated that he awoke at 7:30 a.m. on Friday, 10 August. Mitchell was on McKeys' couch when defendant woke up. Because Mitchell had to appear in court that morning, defendant and Mitchell took a bus from the McKeys' house at 8:30 a.m. to go to the courthouse.

We find that defendant's first trial testimony was primarily given to establish an alibi at the time of the murder in contradiction to the evidence presented by the prosecution. The admission of Crawford's prior inconsistent statements was found by this Court to be improper based upon evidentiary grounds, not *constitutional* grounds. Defendant has failed to show that he was compelled to testify due to the admission of any unconstitutionally obtained evidence; therefore, we reject defendant's argument that he was induced to refute Crawford's out-of-court statements concerning his whereabouts on the morning of the commission of the offense.

The State submits that this issue is controlled by *State v. Farrell*, 223 N.C. 804, 28 S.E.2d 560 (1944). We agree. In *Farrell*, the defendant was indicted for the rape of his stepdaughter. At defendant's first trial, he testified in his own behalf. Defendant was found guilty but on appeal was awarded a new trial. *Id.* at 805, 28 S.E.2d at 561. At the second trial, defendant offered evidence, but he did not testify. On rebuttal, the State was permitted to offer into evidence the defendant's testimony from his first trial. At the second trial, defendant was again found guilty. In rejecting the claim that the first trial testimony was improperly admitted, this Court reasoned that "the defendant offered himself as a witness on the former trial for the very purpose of having the jury consider his testimony in determining his guilt or innocence. What he said then may be used at any subsequent stage of the prosecution." *Id.* at 807, 28 S.E.2d at 563. This Court concluded that "[t]he statements or admissions made by [defendant] while so testifying are in nowise privileged, but may lawfully be offered in evidence on any subsequent trial for the consideration of the jury in passing upon his guilt or innocence." *Id.* at 808, 28 S.E.2d at 564. We find that defendant in the case *sub judice* testified in the first trial for

the very purpose of having the jury consider his testimony in determining his guilt or innocence. There was no compulsion resting on defendant to testify in the first trial, and therefore, we find that the trial court did not err by allowing the prosecutor to introduce defendant's testimony from the first trial.

**[2]** Defendant further contends that the trial court erred by admitting into evidence testimony by the defendant from the first trial regarding defendant's prior conviction for contributing to the delinquency of a minor, specifically Margaret Marie Crawford. Prior to the examination of Cathy Payton, the court reporter from the first trial, defense counsel objected to the introduction of the portion of defendant's first trial testimony referring to the misdemeanor conviction involving Crawford. Defense counsel objected on three grounds: (1) that the State had promised in a plea agreement not to use the 10 August 1984 date against defendant, (2) that the evidence of a prior conviction was not admissible against defendant in the second trial because he was not testifying in the second trial, and (3) that it would be unduly prejudicial to introduce evidence of a plea for a crime relating to Crawford. The trial court told defense counsel that the "best way to [object] . . . is to object as each question may be asked that you perceive is objectionable." Furthermore, the trial court told defense counsel, "I take it you will do so if you perceive something specifically objectionable about the testimony."

After the trial judge's ruling, the State called Payton to read defendant's testimony from the first trial. During direct examination of defendant during the first trial, defense counsel asked, "And on September 11th, 1984, did you plead guilty to contributing to the delinquency of a minor?" Defendant responded "[y]es," that he had pled guilty to the charge of contributing to the delinquency of Margaret Marie Crawford. During Payton's reading of the cross-examination of defendant during the first trial, defense counsel objected to the series of questions dealing with the prior conviction involving Crawford. The trial court overruled this objection, and Payton read into evidence defendant's testimony regarding his conviction of contributing to the delinquency of a minor. The record reflects that there were no specific objections to the questions concerning the plea of guilty of contributing to the delinquency of Crawford, although defense counsel did object to the reading of certain other portions of the transcript.

We conclude that defendant has waived his right to assign error to the introduction of this testimony. It is well established that " '[w]here evidence is admitted without objection, the benefit of a prior objection to the same or similar evidence is lost, and the defendant is deemed to have waived his right to assign as error the prior admission of the evidence.' " *State v. Jolly,* 332 N.C. 351, 361, 420 S.E.2d 661, 667 (1992) (quoting *State v. Wilson,* 313 N.C. 516, 532, 330 S.E.2d 450, 461 (1985)); *see also* 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 30 (3d ed. 1988) (when evidence is admitted over objection but the same evidence has theretofore been or is thereafter admitted without objection, the objection is waived). Because defendant in the case at bar failed to object during the reading of the direct examination regarding his prior conviction, he has waived his right to assign error to the admission of this testimony.

[3] In his next assignment of error, defendant contends that the trial court erred by overruling his objections to the prosecutor's contentions during closing arguments that defendant had the burden of proving his first trial alibi. Specifically, defendant points out that the prosecutor argued that defendant did not call alibi witnesses to prove his alibi from the first trial, which was that he was at Cynthia McKeys' house during the time of the murder. In addition, the prosecutor noted that defendant did not introduce a photograph of himself, which defendant had testified during the first trial was taken on the night of 9-10 August. Defendant contends that the prosecutor's closing argument left the jury with the impression that he had the burden of proving his innocence. We disagree.

Although during closing arguments a prosecutor may not comment on the failure of a defendant to testify at trial, it is permissible for the prosecutor to point out to the jury that the defendant has produced no exculpatory evidence and has contradicted no evidence presented by the State. *State v. Howard,* 320 N.C. 718, 728, 360 S.E.2d 790, 796 (1987). This Court has held that during closing arguments, a prosecutor's comment noting a defendant's failure to produce any alibi witnesses does not constitute an impermissible comment on the defendant's failure to testify. *See State v. Young,* 317 N.C. 396, 346 S.E.2d 626 (1986); *State v. Jordan,* 305 N.C. 274, 287 S.E.2d 827 (1982).

In the case *sub judice*, the prosecutor, in his closing argument, merely argued to the jury that it could consider the fact that defendant did not call any alibi witnesses or introduce a photograph excul-

pating himself. After carefully reviewing the prosecutor's closing argument, we find no error in the trial judge's rulings on defendant's objections to the argument.

**[4]** In his next assignment of error, defendant contends that the trial court committed error by not intervening *ex mero motu* to stop the prosecutor from commenting on defendant's decision not to testify, on the ground that the trial court's failure to do so violated defendant's rights under the Fifth and Fourteenth Amendments to the United States Constitution and Article I of the North Carolina Constitution. We disagree.

The relevant portion of the prosecutor's argument is as follows:

And here's another thing that made me real happy. I put three stars right by this one. [Defense counsel] said—and I quote. He talked about, quote, the State put in [defendant's] transcript and then he said and I put it in quotes, underline[d] it. After the State put in [defendant's] transcript, he said, thereafter—remember this word, thereafter, we decided not to have [defendant] testify. That's important. When did these two lawyers decide not to have [defendant] testify? It wasn't before; it wasn't during; it was thereafter.

Now, ask yourselves that question. These two fine lawyers here, why would they wait to make that decision thereafter? I'll tell you why they waited to make it. Because after this came into evidence, his sworn testimony at the other trial, you see what happened then the reason it was thereafter, this man right here was boxed in. He was in a box. Right here's the box. Right here's what he said back in 1985 and thereafter. In case he wanted to change horses, that pretty much eliminated that, didn't it? If his alibi was a nag through this trial, maybe he had an idea of crawling on a thoroughbred up here in Hickory.

Defendant did not object to the prosecutor's comments, which he now asserts are error. The arguments of counsel are left largely to the control and discretion of the trial judge. *State v. Shank*, 327 N.C. 405, 407, 394 S.E.2d 811, 813 (1990). Counsel are granted wide latitude in the scope of their argument. *Id.* Counsel's argument is not improper where counsel argues the law, the facts in evidence, and all reasonable inferences to be drawn therefrom. *Id.* Only where counsel's argument affects the right of the defendant to a fair trial will the trial judge be required to intervene where no objection is made. *State v.*

*Hill,* 311 N.C. 465, 472, 319 S.E.2d 163, 168 (1984). This Court has held that where a defendant fails to object to the closing argument by the prosecutor, the trial court is required to intervene *ex mero motu* only if the remarks are grossly improper. *Id.* We cannot conclude that the trial judge erred in not intervening *ex mero motu* in this instance. We note that the defendant himself argued through one of his counsel that, "[o]f course, the State, as part of its case, put in [defendant's] testimony from the prior trial and thereafter we decided not to have [defendant] testify further in the case." We note further that defense counsel argued that "[defendant's] silence in this trial is not to influence your decision in any way, and I'm sure the judge will give you instructions substantially as I tell you." We do not find the closing argument of the prosecutor to be grossly improper, and therefore, the trial judge did not err in failing to intervene *ex mero motu.* This assignment of error is overruled.

[5] Defendant next assigns error to the charge on reasonable doubt. During the charge conference, defendant requested that the trial judge give the following instruction:

> A reasonable doubt is a doubt based on reason and common sense, arising out of some or all of the evidence that has been presented, or lack or insufficiency of the evidence, as the case may be. Proof beyond a reasonable doubt is proof that fully satisfies or entirely convinces you of the defendant's guilt.

*See* N.C.P.I.—Crim. 101.10 (1974). Instead, the trial court charged:

> A reasonable doubt, members of the jury, is not a mere possible doubt[,] for most things that relate to human affairs are open to some possible or imaginary doubt. But rather a reasonable doubt is a fair doubt based on reason and common sense and growing out of some evidence or lack of evidence in the case.

After the charge to the jury, defense counsel renewed the request that the trial judge give the Pattern Jury Instruction, with particular emphasis on the last sentence, which states in part that "[p]roof beyond a reasonable doubt is proof that fully satisfies or entirely convinces you of the defendant's guilt." The failure of the trial judge to give the requested instruction is the basis for this assignment of error.

In the absence of a request, the trial court does not have to define reasonable doubt. *State v. Watson,* 294 N.C. 159, 167, 240 S.E.2d 440, 446 (1978). However, once the court undertakes to do so, the definition must be given in substantial accord with those that have been

approved by this Court, although no exact formula is required. *Id.* The trial court is not required to read the requested instruction verbatim. *State v. Greene*, 324 N.C. 1, 17, 376 S.E.2d 430, 440 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 329 N.C. 771, 408 S.E.2d 185 (1991). In *Greene*, this Court ruled that the trial court did not err by declining to instruct the jury that proof beyond a reasonable doubt is proof that fully satisfies or entirely convinces the jury of the defendant's guilt. This Court said that "[w]hile the language defendant requested was appropriate, it was not essential to an accurate definition of reasonable doubt, and the refusal to give the requested instruction verbatim was not error." *Id.* In the case *sub judice*, we find that the instructions given adequately reflected the substance of defendant's requested instructions. We hold that the reasonable doubt instruction given by the trial judge was not constitutionally deficient and that the trial judge did not err in refusing to give defendant's requested instructions verbatim. We overrule this assignment of error.

[6] Defendant further contends that the trial court erred in allowing the State to introduce into evidence Sammy Mitchell's testimony from the first trial. At the time of the first trial, Mitchell was not a defendant in the case. On 16 January 1990, five years after the first trial, Mitchell was indicted as a codefendant. During the second trial, the State called Mitchell as a witness, whereupon defense counsel objected and the jury was excused. Outside the presence of the jury, Mitchell took the witness stand, and when asked his name by defense counsel, Mitchell responded, "I refuse to answer any questions based on my Fifth Amendment right and the advice of my counsel." Upon being asked several more questions, Mitchell responded in the same manner. The prosecution then asked that Mitchell be declared an unavailable witness and asked that the court reporter be allowed to read Mitchell's testimony from the first trial into the record. The trial judge found Mitchell to be an unavailable witness and under Rule 804(b)(1) permitted Mitchell's testimony from the first trial to be read into evidence. Defendant assigns error to the trial court's ruling.

Defendant contends that the State's introduction of Mitchell's first trial testimony was improper under Rule 804(b)(1) and deprived him of the right of confrontation guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution because defendant did not have the same motive in examining Mitchell at the first trial that he would have had during the second trial. At the first trial, Mitchell testified that both he and defendant spent the entire

night of 9-10 August at 1905 Dunleith, that he went to bed at 11:00 on 9 August, and that he awoke at 7:00 a.m. on 10 August.

Defendant's strategy in his first trial was to link himself to Mitchell on the night of 9-10 August because Mitchell supported his alibi and defendant had no reason to doubt Mitchell's credibility. In contrast, during the second trial, because of Mitchell's intervening indictment, defendant wanted to avoid linking himself to Mitchell on the night of 9-10 August. Therefore, defendant argues, his motive for developing Mitchell's testimony during the first trial differed from what his motive was during the second trial.

N.C.G.S. § 8C-1, Rule 804 provides in pertinent part:

> (a) Definition of unavailability.—"Unavailability as a witness" includes situations in which the declarant:
>
> (1) Is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement[.]
>
> . . . .
>
> (b) Hearsay exceptions.—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (1) Former Testimony.—Testimony given as a witness at another hearing of the same or a different proceeding . . . if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

N.C.G.S. § 8C-1, Rule 804(a)(1), (b)(1) (1992).

In *State v. Grier*, this Court held that, as a general rule, the recorded testimony of a witness in a former trial will not be admitted as substantive evidence at a later criminal trial because the prior testimony is considered inadmissible hearsay under the Confrontation Clause of the Sixth and Fourteenth Amendments to the United States Constitution. 314 N.C. 59, 64, 331 S.E.2d 669, 673 (1985). The witness himself must be produced to testify *de novo* where possible. *Id.* However, even though there exists a preference for face-to-face confrontation at trial, Rule 804(b)(1) recognizes an exception to this requirement.

In the present case, we find that the trial court properly admitted Mitchell's first trial testimony into evidence over defendant's objections. As the trial court found, Mitchell was unavailable because he asserted his constitutional right against self-incrimination. Mitchell was called as a defense witness at the first trial in which defendant was also being tried for the same offense, the first-degree murder of the same victim, and defendant, being represented by counsel, had ample opportunity to question Mitchell on direct examination, as well as on redirect examination.

Defendant asserts that Mitchell was an alibi witness at the first trial and that he did not have a similar motive in questioning Mitchell during the second trial. We disagree. There was testimony at the first trial that defendant was seen with Mitchell several hours before the time of the victim's death. Mitchell's subsequent indictment did not change the fact that Mitchell was called as a defense witness and testified at defendant's first trial. Although the trial strategy by defense counsel may have been different at the second trial, there has been no reasonable showing that the motive would have been different. The motive was to seek the facts favorable to defendant regarding defendant's whereabouts at the time of the crime, and defense counsel had ample opportunity to develop this testimony. On the facts presented by the record, we find that the State has met the requirements of the exception in Rule 804(b)(1). Mitchell's first trial testimony was properly admitted into evidence in defendant's second trial.

[7] Defendant further contends that the trial court erred by denying his motion to exclude Roger Weaver's in-court identification of defendant. In *Hunt I*, this Court addressed, without deciding, defendant's contention that the State had violated his right to effective assistance of counsel under the Sixth Amendment by conducting a postindictment lineup after prohibiting defense counsel from being in the presence of the witness during the lineup. Although this Court declined to decide the merits of the issue due to defendant's failure to preserve the issue in the first trial, we did discuss the applicable legal principles to guide the trial court and the parties in the retrial. *Hunt I*, 324 N.C. at 354-55, 378 S.E.2d at 760-61. This Court stated that the Sixth Amendment guarantees defendant's right to have counsel present at a postindictment lineup where the accused is exhibited to an identifying witness to a crime. *Id.* In such circumstances, a defendant is entitled to the presence of counsel in order to prevent or remedy " 'dangers and variable factors which might seriously, even crucially, derogate from a fair trial.' " *Id.* at 355, 378 S.E.2d at 761 (quoting

*United States v. Wade*, 388 U.S. 218, 228, 18 L. Ed. 2d 1149, 1158 (1967)). The in-court identification of a witness who took part in an illegal pretrial confrontation must be excluded unless it is first determined by the trial judge on clear and convincing evidence that the in-court identification is of independent origin and thus not tainted by the illegal pretrial identification procedure. *Wade*, 388 U.S. at 239, 18 L. Ed. 2d at 1164. Defendant argues that the State did not prove by clear and convincing evidence that Weaver's in-court identification was based on his observations of defendant other than during the illegal lineup, and therefore, the trial court erred in denying defendant's motion to exclude Weaver's in-court identification. We disagree.

The trial court conducted a hearing on defendant's motion to exclude the identification testimony of Roger Weaver. On *voir dire*, Weaver testified that in 1984 he was employed as an auditor by the Hyatt House in Winston-Salem. Between 4:00 a.m. and 5:00 a.m. on 10 August, Weaver was moving his car from the parking deck to the street when he observed two black males standing on the corner. The area at the time was well lit by street lights. Weaver testified that the previous spring and summer, he had seen the slimmer of the two men in the Hyatt House five or six times when the man would ask permission to use the rest room. On each of these prior occasions, Weaver and the man had brief conversations. Usually, the man would come through the automatic doors entering into the lobby, which was well lit, and speak to Weaver. Weaver noted that the man's hairstyle was sometimes "bushy" and sometimes in "braids."

Weaver stated that later in the morning of 10 August, he saw this same man. The man came to the automatic doors of the hotel lobby and tried to enter through the exit door. When the exit door would not open, the man pulled the door open, stepped in on the activator, and the doors opened behind him. At this time, the man turned and made eye contact with Weaver. Weaver related that at this time, there was nothing obstructing his view of the man. Once the man entered the lobby, he went directly to the rest room. The man stayed in the rest room for an unusually long period of time. Weaver told the security guard that someone was in the rest room; defendant left immediately after the security guard entered the rest room. When the man was leaving, he looked straight at Weaver. Weaver testified that he and the man made eye contact at least three times on the morning of 10 August 1984. Weaver identified the man that he saw in the hotel on 10 August as the defendant. Specifically, the prosecutor asked Weaver, "independent of any photographs, lineups or anything else

that you may have been shown some date subsequent to that, I'll ask you whether or not you recognize the man in this courtroom that you saw come and go as you described on that morning of August 10?" Weaver responded, "Yes, I recognized him from being in the hotel."

On cross-examination during *voir dire* of Weaver, defense counsel brought out evidence from the first trial to impeach Weaver. The following colloquy took place between defense counsel and Weaver:

Q. All right. Well, again—Now, when you were asked about this under oath back in 1985, you testified that you based your identification in court on the lineup in addition to what you say you saw on the 10th in the hotel; isn't that right?

A. I didn't base it but I confirmed. I would use the word confirm.

Q. Well, let's look at the word you used back in June of 1985, Mr. Weaver. On page 1219 at line 4 you were asked, "Are you basing your identification of [defendant] here in court today based on what you saw on August 10 or something you saw afterwards?" And your answer was, "And the lineup is what I'm basing it on." Isn't that what you said then?

A. The lineup was basing it on that it was the same person I had seen in the hotel.

. . . .

Q. All right. So you based it on the lineup and what you say you saw; isn't that right?

A. On the lineup and the picture in the paper.

Weaver further testified on cross-examination that he did not make the connection that defendant was the same man he had seen at the hotel on 10 August until he recognized defendant's picture in the newspaper in September. Weaver also stated, "I didn't depend on a lineup. I had already recognized him through the picture in the paper." In addition, Weaver explained that he had misled the police by not reporting that he had seen defendant on the night in question because he was fearful for his safety since he was so easily accessible to the public while on duty at the hotel. Weaver did not view the lineup until 15 May 1985, three weeks before the first trial and nine months after the murder. Following the *voir dire* hearing, the trial court denied defendant's motion to suppress the in-court identifica-

tion of defendant by Weaver but ruled that the prosecution could not offer evidence relating to the lineup.

In *Wade*, the Supreme Court set forth several criteria with which to determine whether an in-court identification is tainted by, or independent of, an illegal lineup:

> the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification.

*Wade*, 388 U.S. at 241, 18 L. Ed. 2d at 1165; *see State v. McCraw*, 300 N.C. 610, 615, 268 S.E.2d 173, 176 (1980).

In the case *sub judice*, Weaver stated during *voir dire* that he had observed defendant on the morning of 10 August and that they had eye contact at least three times on that morning. Weaver also stated that he had seen defendant on at least five or six prior occasions in the hotel lobby and that he and defendant usually had brief conversations when defendant came into the hotel to use the rest room. Weaver never identified anyone other than defendant. Furthermore, Weaver stated numerous times that the lobby was well lit and that nothing was obstructing his view of defendant when he came into the hotel. Considering the totality of the circumstances, we conclude, as a matter of law, that Weaver's ability to identify defendant as the person he saw in the hotel on the morning of 10 August was not the product of the illegal lineup but originated independently of the illegal lineup. Therefore, the trial court did not err in admitting Weaver's identification testimony, notwithstanding alleged defects or irregularities in the lineup procedure.

[8] In his next assignment of error, defendant asserts that the trial court erred by failing to instruct the jury that defendant's active or constructive presence at the scene of the crime is an essential element of the theories of acting in concert and aiding and abetting. Because a trial court must instruct the jury on every essential element of an offense, defendant argues that the trial court's failure to instruct that presence is an element of acting in concert constitutes error because the witnesses at trial differed greatly on the question of whether defendant was the actual perpetrator of the crime. Defend-

ant further submits that the same reasoning applies to the failure to instruct that presence is an essential element of aiding and abetting. Defendant concedes that there was no objection to the trial court's instructions or a request for such an instruction, and therefore, this assignment is determined under the plain error standard of review. *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983); N.C. R. App. P. 10(b)(2).

In the present case, we find no plain error in the instructions given that would mandate a new trial in defendant's case.

In the charge, the trial court instructed the jury that the burden was on the prosecution to prove beyond a reasonable doubt that "defendant was the perpetrator, or aided and abetted the perpetrator, or acted together with another in perpetrating the crime charged." Thereafter, the jury was again instructed on acting in concert and on aiding and abetting as follows:

Now, members of the jury, for a person to be guilty of a crime, it is not necessary that he himself do all of the acts necessary to constitute the crime. If two or more persons act together with a common purpose to commit first degree murder on the basis of robbery, rape, sexual offense, or kidnapping, each of them is held responsible for the acts of the others done in the commission of such. This is known as the legal doctrine acting in concert.

Now, members of the jury, a person may be guilty of first degree murder although he personally does not do any of the acts necessary to constitute that crime. A person who aids and abets another to commit a crime is guilty of that crime. You must clearly understand that if he does aid and abet, he is guilty of the crime just as if he had personally done all the acts necessary to constitute that crime.

The trial court specifically charged the jury that in regard to finding defendant guilty of first-degree murder on the basis of aiding and abetting, "a person is not guilty of a crime merely because he is present at the scene even though he may silently approve of the crime or secretly intend to assist in its commission." The jury was then instructed on acting in concert and on aiding and abetting as they apply to the felony murder rule.

The instruction on acting in concert given by the trial judge was taken from our Pattern Jury Instructions for criminal cases. *See* N.C.P.I.—Crim. 202.10 (1971). In addition, this Court has approved

charges on acting in concert very similar to the charge in this case in *State v. Gilmore*, 330 N.C. 167, 171, 409 S.E.2d 888, 890 (1991), and in *State v. Williams*, 299 N.C. 652, 658, 263 S.E.2d 774, 778 (1980). It is well settled that a charge on presence at the scene of the crime is unnecessary in a case in which the evidence shows that the defendant was actually present at the time the crime was committed. *Id.* We find that the evidence in the record before us in this case overwhelmingly establishes defendant's presence and participation. The evidence of defendant's actual or constructive presence at the scene of the murder was sufficiently substantial that a charge on this feature of the case was not necessary. Defendant has failed to show plain error in the trial judge's failure to give the requested instruction. This assignment of error is overruled.

[9] Defendant next contends that the trial court committed error by not intervening *ex mero motu* to stop what defendant contends was the prosecutor's grossly improper emotional appeal to the jury during closing argument. Defendant acknowledges that no objections were made to the portions of the prosecutor's argument to which exceptions have been entered.

Defendant sets forth several portions of the prosecutor's closing argument that he claims were grossly improper. First, defendant refers to the references made by the prosecutor to the loss suffered by the victim's family. For example, the prosecutor stated, "And Deborah Sykes' life was not just her life. Those were her clothes. Those were her shoes. But her life was not just her life. She had a husband. She had a mother. Deborah Sykes' life belonged to all those people that cared about her." Next, defendant refers to the prosecutor's argument about the victim's physical and emotional pain and suffering as being grossly improper. The prosecutor said, "And lastly, what—ask yourselves. What was Deborah Sykes thinking when she knelt on all fours, bleeding, gasping no doubt for breath. No doubt dying as she watched that man right there run across the field. Her assassin, her assassin." As to the third portion of the closing argument asserted to be grossly improper, defendant refers to the inference by the prosecutor to the fact that a young woman's life ended long before its time: "Maybe she thought about buying that house . . . ; having a family. Maybe she was thinking about having a baby." Lastly, defendant maintains that the prosecutor's argument concerning deterring violence was grossly improper. The prosecutor argued that "[i]t's time people like you stood up and you say that's enough, that's enough. We're not going to stand for it any more. Let the message ring

out and let it ring out loud and clear. That's enough. Enough." Defendant contends that the prosecutor's argument was calculated to replace reason with raw emotion as a basis for the jury's verdict and thus was grossly improper.

The arguments of trial counsel are left largely to the control and discretion of the trial judge, and counsel will be granted wide latitude in the argument of hotly contested cases. *State v. Soyars*, 332 N.C. 47, 60, 418 S.E.2d 480, 487 (1992). Counsel is permitted to argue the facts that have been presented, as well as reasonable inferences that can be drawn therefrom. *State v. Williams*, 317 N.C. 474, 481, 346 S.E.2d 405, 410 (1986). If a party fails to object to a closing argument, this Court must decide whether the argument was so improper as to warrant the trial judge's intervention *ex mero motu. State v. Craig*, 308 N.C. 446, 457, 302 S.E.2d 740, 747, *cert. denied*, 464 U.S. 908, 78 L. Ed. 2d 247 (1983). The standard of review is one of "gross impropriety." *Id.*

In *State v. King*, 299 N.C. 707, 264 S.E.2d 40 (1980), this Court found that the prosecutor's remarks during closing, concerning what the victim must have been thinking as he was dying and what the family of the victim experienced following the loss, were not grossly improper. In addition, this Court has held that the prosecutor's remarks reminding the jury that for purposes of the defendant's trial, it was acting as the voice and conscience of the community are permissible. *State v. Soyars*, 332 N.C. at 61, 418 S.E.2d at 488; *State v. Brown*, 320 N.C. 179, 203, 358 S.E.2d 1, 18 ("[W]hen you hear of such acts, you say, 'Gee, somebody ought to do something about that.' You know something, Ladies and Gentlemen of the Jury, today you are the somebody that everybody talks about . . . ."), *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). Furthermore, the prosecutor's closing statements regarding the victim and the pain she experienced were based upon the medical evidence presented at trial and thus were properly permitted. We find that the trial court did not err by failing to intervene *ex mero motu* during the prosecutor's closing argument. This assignment of error is overruled.

[10] Defendant next argues that the trial court committed prejudicial error in refusing to admit factual findings contained in a report by the city manager and an exhibit to that report which is a photo composite of defendant. At trial, Al Beaty, the assistant city manager for Winston-Salem, testified that after the first trial in this matter, he was asked by the city manager to do a review of the Winston-Salem Police

Department's investigation of the Deborah Sykes murder. After conducting the review, Beaty testified that he prepared a report entitled, *Review of the Winston-Salem Police Department's Investigation of the Deborah B. Sykes Murder* (hereinafter the City Manager's Report). The report was released by the city manager's office on 20 November 1985. At the conclusion of Beaty's testimony, the report and an exhibit from the report were offered as evidence by the defendant. The State's objection to defendant's request to have the report introduced into evidence was sustained. At the conclusion of the evidence for the defense, the report and exhibit were again offered into evidence, and the State's objection was again sustained. Defendant contends that the report was admissible as substantive evidence as an exception to the hearsay rule pursuant to Rule 803(8)(C) of the North Carolina Rules of Evidence and that the judge's failure to allow the actual report into evidence constituted prejudicial error. We disagree.

Rule 803 states in pertinent part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> (8) Public Records and Reports.—Records, reports, statements, or data compilations, in any form, of public offices or agencies setting forth . . . (C) in civil actions and proceedings and against the State in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

N.C.G.S. § 8C-1, Rule 803(8)(C) (1992). In *State v. Acklin*, 317 N.C. 677, 346 S.E.2d 481 (1986), this Court addressed the issue of whether the trial court erred by not allowing into evidence under Rule 803(8)(C) the laboratory reports prepared by two SBI agents employed as forensic chemists. The first agent testified that a hair found on the victim's pubic region did not come from the defendant. The second agent testified that, in his opinion, the semen found on the victim's underwear did not come from the defendant. Although the agents were permitted to testify, the trial court sustained the prosecutor's objections to the introduction of their laboratory reports. In granting the defendant a new trial, this Court concluded that the reports were admissible pursuant to Rule 803(8)(C), stating:

The laboratory reports defendant sought to introduce meet the standards of admissibility under Rule 803(8)(C): (a) both reports were prepared by the State Bureau of Investigation, a public office or agency pursuant to authority granted by law, (b) containing factual findings, (c) to be introduced against the State in a criminal case, and (d) containing, given the impartiality of the SBI chemists and the right to examine and cross-examine witnesses, adequate assurances of trustworthiness.

*Id.* at 682, 346 S.E.2d at 484.

In the case *sub judice*, Beaty specifically testified that in conducting his review for the City Manager's Report, he "first analyzed and gave some study to the concerns that had been raised and the information that [he] received from Reverend Lassiter and, as a result of hearing and understanding what those concerns were, [he] sought out then to interview individuals who would have information . . . that would answer some questions with regard to the concerns." Beaty further stated that he read the testimony from the first trial and interviewed various people within the police department and others "to try to come to some conclusions with respect to the questions that had been raised." In addition, the report itself states that "[o]n August 13, 1985, Alderman Vivian H. Burke presented a report to the City Manager that had been compiled by Reverend Leonard V. Lassiter, Jr. The report contained various allegations and concerns regarding the Police Department's investigation that had been shared with Reverend Lassiter by concerned citizens." The report later states that "[t]he Lassiter report . . . was used as the basis for our review of the Police Department's activities in the investigation of this case." In conducting the review, interviews were conducted with "persons employed by the Police Department, the District Attorney's Office, the Darryl Hunt Defense Attorneys, the Forsyth County Jail staff, and private citizens."

Because the City Manager's Report does not fall within the Rule 803(8)(C) exception as interpreted in *Acklin*, we find that the trial court did not err by sustaining the State's objection to the introduction of the City Manager's Report and the exhibit from the report. The City Manager's Report was not the result of "authority granted by law" to conduct an investigation into the Sykes' murder, there was no assurance that the report contained factual findings that would be admissible, and the report was not prepared for the purpose of being introduced against the State in a criminal case. Furthermore, the

prosecution did not have an opportunity to cross-examine the persons interviewed for the report. Because the City Manager's Report did not fit into the exception, it was hearsay and therefore properly excluded by the trial court.

**[11]** Defendant's next assignment of error concerns the trial court's denial of his motion to conduct an *in camera* inspection of an SBI investigative file. After the first trial, the SBI and the Winston-Salem Police Department reinvestigated the case and prepared a three thousand page report on the investigation. Defendant filed a written motion for disclosure of the SBI report under *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215 (1963). The trial court denied defendant's motion for disclosure of the report. After the commencement of the trial, the record shows that during the prosecutor's direct examination of Kevey Coleman, defense counsel requested a copy of any statement made by the witness to the SBI. The prosecutor responded that he did not have a copy in his file at the time but that he would get it and make a copy of the statement. Thereupon, defense counsel made a motion for a mistrial alleging that the prosecution had violated *Brady* by withholding material from the defense. However, in his argument, defense counsel acknowledged that he had previously been provided with four statements from Coleman. Defense counsel further asserted that these statements were part of an SBI report that had been requested by the defense prior to trial, but that his request had been denied. At this point, defense counsel asked the trial court to review the SBI report to determine if there was any exculpatory material.

In response, the prosecutor informed the trial court that at this point in the trial, the defense had been provided with the statements of all of the prosecution witnesses at the conclusion of their testimony. Following further testimony and arguments, the trial court declined to review the SBI report but ordered the State to deliver the SBI report to the trial court and to place the report under seal. During the trial, the trial court denied defendant's subsequent motion to unseal the SBI report for the limited purpose of determining whether any portion of the report constituted findings admissible under N.C.G.S. § 8C-1, Rule 803(8)(C). As the trial continued, the prosecution provided defense counsel with copies of each witness' statement following his or her direct examination. At the conclusion of the trial, defense counsel renewed the motion to have the SBI report unsealed. The motion was denied. In an order dated 20 July 1992, this Court granted defendant's motion to order certification of the SBI report to

this Court but denied defendant's motion to order that the report be unsealed.

We conclude that the trial court did not err in denying defendant's motion for access to the SBI report or for an *in camera* inspection. N.C.G.S. § 15A-903(d) requires the disclosure to the defendant of all documents and tangible objects "which are material to the preparation of his defense, are intended for use by the State as evidence at the trial, or were obtained from or belonged to the defendant." However, the next section of the statute, N.C.G.S. § 15A-904, limits the application of N.C.G.S. § 15A-903 and is dispositive of the issue of prosecution witnesses' statements. N.C.G.S. § 15A-904(a) provides as follows:

> Except as provided in G.S. 15A-903(a), (b), (c) and (e), this Article does not require the production . . . of statements made by witnesses or prospective witnesses of the State to anyone acting on behalf of the State.

N.C.G.S. § 15A-904(a) (1988); *see State v. Hardy*, 293 N.C. 105, 124, 235 S.E.2d 828, 839 (1977). Therefore, the investigative files of the district attorney, law enforcement agencies, and others helping to prepare the case are not open to discovery. *State v. Alston*, 307 N.C. 321, 336, 298 S.E.2d 631, 642 (1983). The trial court did not err in refusing to order the State to disclose the SBI report to defendant. In addition, notably lacking from the list of subsections that are excluded from the scope of N.C.G.S. § 15A-904(a) is subsection (f) of N.C.G.S. § 15A-903. In *State v. Soyars*, this Court held that:

> [A] [d]efendant is also statutorily entitled to any statement of a witness other than the defendant, in the possession of the State and relating to the subject matter of the witness' testimony, once the witness has testified. N.C.G.S. § 15A-903(f) (1988). If the State wishes to withhold a statement, the court must conduct an in camera review of the statement to determine whether the statement relates to the subject matter of the testimony. However, as defendant's request came prior to the testimony of any of the witnesses, he was not yet entitled to such statements and an in camera review would have been premature. Thus, defendant's right to access to evidence, prior to trial, was not violated.

332 N.C. at 63, 418 S.E.2d at 489-90.

Because the prosecutor in the case *sub judice* provided defense counsel with prior statements made by the prosecution's witnesses

after they testified on direct examination, the trial court was not required to conduct its own *in camera* review of the SBI report under these circumstances.

Defendant claims that the information sought was discoverable under *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215. The United States Supreme Court has held that due process does not require the State to make complete disclosure to defendant of all of the investigative work on a case. *Moore v. Illinois*, 408 U.S. 786, 33 L. Ed. 2d 706, *reh'g denied*, 409 U.S. 897, 34 L. Ed. 2d 155 (1972). "[N]o statutory provision or constitutional principle requires the trial court to order the State to make available to a defendant all of its investigative files relating to his case . . . ." *State v. McLaughlin*, 323 N.C. 68, 85, 372 S.E.2d 49, 61 (1988), *sentence vacated on other grounds*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990), *on remand*, 330 N.C. 66, 408 S.E.2d 732 (1991). *Brady* only requires the disclosure, upon request, of evidence favorable to the accused and not a disclosure of all evidence. Moreover, in *United States v. Agurs*, 427 U.S. 97, 49 L. Ed. 2d 342 (1976), the Supreme Court clarified *Brady* and held that the prosecutor is constitutionally required to disclose only any evidence that is favorable and material to the defense. In determining whether the suppression of certain information was violative of a defendant's right to due process, the focus should be on the effect of the nondisclosure on the outcome of the trial, not on the impact of the undisclosed evidence on the defendant's ability to prepare for trial. *Id.* at 109, 49 L. Ed. 2d at 353. Because the evidence withheld must be material, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Id.* Defendant in the case at bar has failed to establish that any evidence not disclosed from the SBI report was "material" and what effect, if any, the nondisclosure would have had on the outcome of the trial. This Court finds no constitutional principle under *Brady* that would require the trial court to order the State to make available to defendant the SBI report or to conduct an *in camera* inspection of the SBI report.

[12] Defendant next argues that the trial court committed reversible error by prohibiting defendant from impeaching the testimony of prosecution witness Johnny Gray under N.C.G.S. § 8C-1, Rule 608(b) through cross-examination regarding a lawsuit brought by Gray. During cross-examination by defense counsel, Gray was asked:

Q. In 1988, you made some allegations in a lawsuit that you had been beaten up in jail, didn't you?

MR. BOWMAN: OBJECTION.

THE COURT: SUSTAINED.

After the trial court sustained the prosecutor's objection, defendant made an offer of proof. During *voir dire*, Gray testified that in 1988, he had filed a complaint in the United States District Court for the Middle District of North Carolina alleging brutality by an officer with the Winston-Salem Police Department. In the complaint, Gray claimed that Reginald Craven and Darryl Ford had witnessed his injuries. Gray verified that he had written a letter to Ford asking him to be a witness for him. At the bottom of the letter to Ford, Gray admitted that he wrote, "If you need any money, write and let me know, all right." However, Gray stated that he never offered Craven any money in exchange for his testimony. Gray stated that he knew that Craven submitted an affidavit in the lawsuit stating that he had not witnessed any of the matters that defendant alleged in the lawsuit. In addition, Ford sent a comparable affidavit denying any knowledge of the alleged brutality against Gray. Gray further conceded that the federal magistrate dismissed his lawsuit. After the offer of proof, the trial court again sustained the prosecution's objection to the evidence regarding the content of Gray's complaint in the lawsuit, without stating a basis for its ruling.

Defendant asserts that the trial court committed reversible error by prohibiting defendant from cross-examining Gray, under Rule 608(b), regarding the lawsuit that he had brought against law enforcement officers in which he made false allegations.

N.C.G.S. § 8C-1, Rule 608(b) provides that specific instances of conduct of a witness may, "in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness . . . concerning his character for truthfulness or untruthfulness." As the rule provides, it is within the trial court's discretion to allow or disallow cross-examination of a witness about his specific acts if the acts are relevant to his character for truthfulness or untruthfulness. Therefore, "the only character trait relevant to the issue of credibility is veracity or the lack of it." *State v. Morgan*, 315 N.C. 626, 634, 340 S.E.2d 84, 90 (1986). In *Morgan*, this Court found that "the types of conduct most widely accepted as falling into this category are 'use of false identity, making false state-

ments on affidavits, applications or government forms (including tax returns), giving false testimony, attempting to corrupt or cheat others, and attempting to deceive or defraud others.' " *Id.* at 635, 340 S.E.2d at 90 (quoting 3 David Louisell & Christopher B. Mueller, *Federal Evidence* § 305 (1979)). A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision. *State v. Barts*, 316 N.C. 666, 682, 343 S.E.2d 828, 839 (1986).

Assuming *arguendo* that there was error in the exclusion of the evidence regarding the complaint as probative of Gray's character for truthfulness, we conclude that there is no reasonable possibility that the outcome of the trial would have been different if the excluded evidence had been admitted. N.C.G.S. § 15A-1443 (1988). This assignment of error is overruled.

**[13]** In defendant's final assignment of error, he contends that the trial court erred in excluding testimony by defense witness Lee Haigy regarding the basis for Lee's opinion about the untruthfulness of prosecution witness Donald (Don) Haigy, Lee's brother. During direct examination of Lee Haigy, defense counsel asked, "What is your opinion as to [Don's] character for truthfulness or untruthfulness? Does [Don] tell the truth or does he not tell the truth?" Lee responded that he did not believe Don. When asked what Don's reputation was for telling the truth, Lee responded "[h]e's a very dishonest person." Thereupon, Lee was asked upon what he based his opinion, and the prosecutor's objection was sustained. Defense counsel was permitted to proffer Lee's basis for his opinion into the record. During *voir dire,* Lee stated that Don would do "whatever it takes to come out ahead. If he needs to plea bargain or whatever he needs to do, he'll do it." Lee further stated that Don had been in trouble with the law from the time that he was twelve years old. Defendant asserts that the basis for Lee's opinion regarding Don's character is admissible under both Rule 405(a) and Rule 608(a) of the North Carolina Rules of Evidence. We disagree.

We find that Rule 405(a) is not applicable because Lee's responses to the questions do not relate to specific instances of conduct.

Rule 608(a) provides in pertinent part that "[t]he credibility of a witness may be attacked or supported by evidence in the form of reputation or opinion as provided in Rule 405(a)." Rule 608(a) pertains solely to reputation or opinion testimony. In the case at bar, defense

counsel sought to have Lee testify that he based his opinion on the fact that Don would do "whatever it takes to come out ahead. If he needs to plea bargain or whatever he needs to do, he'll do it." Lee further testified during *voir dire* that Don had been in trouble with the law since he was twelve. This is not evidence in the form of reputation or opinion contemplated by Rule 608(a). We overrule this assignment of error.

We have conducted a thorough review of the transcript of the trial and sentencing proceeding, the record on appeal, and the briefs of defendant and the State. We find no error in defendant's trial warranting reversal of defendant's conviction.

[14] On 22 October 1990, subsequent to the entry of judgment in the Trial Division but prior to the docketing of the appeal with this Court, defendant filed in the Superior Court, Forsyth County, a Motion for Appropriate Relief. On 1 February 1993, subsequent to the docketing of the appeal with this Court but prior to oral argument, defendant filed with this Court a Supplemental Motion for Appropriate Relief. On 18 February 1993, this Court entered an order remanding defendant's Supplemental Motion to the Superior Court, Forsyth County, consolidating the same with defendant's previously filed Motion of 22 October 1990 and ordering that court to conduct an evidentiary hearing on defendant's motions filed 22 October 1990 and 1 February 1993. From 20 June 1993 through 30 June 1993, the Superior Court, Forsyth County, Melzer A. Morgan, Jr., judge presiding, held an evidentiary hearing as directed by this Court. On 1 July 1993, pursuant to a motion filed 29 June 1993 to amend our 18 February 1993 order, this Court entered an additional order directing an *in camera* review of the SBI report.

Defendant subsequently filed with the trial court an Amendment to Supplemental Motion for Appropriate Relief dated 15 October 1993 and thereafter, on 17 November 1993, filed with the trial court a Second Amendment to Supplemental Motion for Appropriate Relief. On 22 through 24 and 29 November 1993, Judge Morgan held additional hearings. On 12 August 1994, he entered a 210-page order making appropriate findings of fact and conclusions of law and denying each of defendant's motions.

On 8 September 1994, this Court granted in part defendant's Motion for Supplemental Briefing and Oral Argument, set a briefing schedule, and denied defendant's request for oral argument on the motion. Defendant subsequently filed additional motions in the Supe-

rior Court, Forsyth County, and filed with this Court a Motion to Toll Appeal, attaching his recently filed Superior Court motions. On 26 October 1994, this Court allowed defendant's Motion to Toll Appeal, treated defendant's attached motions as an amendment to defendant's original 22 October 1990 Motion for Appropriate Relief, and remanded the same for an evidentiary hearing before Judge Morgan. Following an evidentiary hearing on 7 November 1994, Judge Morgan denied defendant's subsequently filed motions by order dated 10 November 1994.

We have carefully reviewed the findings of fact and conclusions of law of the extensive order entered by Judge Morgan dated 12 August 1994, and the findings of fact and conclusions of law of his subsequent order dated 10 November 1994, and we hereby adopt the same as our own. Defendant's Motion for Appropriate Relief as supplemented and amended as heretofore described is denied. Judge Morgan's orders of 12 August 1994 and 10 November 1994 are hereby affirmed in all respects.

NO ERROR.

Justice FRYE dissenting.

I dissent from that portion of the Court's opinion which adopts the findings and conclusions of law contained in Judge Morgan's orders of 12 August and 10 November 1994 and denies defendant's motion for appropriate relief. I agree with Judge Morgan's conclusion that defendant's motion to dismiss should be denied. However, I disagree with his conclusion that defendant is not entitled to a new trial based on newly discovered evidence related to PCR/DNA analysis.

A defendant seeking a new trial on the basis of newly discovered evidence has a heavy burden to meet. As we said in *State v. Britt*:

Our usual standard for evaluating motions for a new trial on the grounds of newly discovered evidence requires a defendant to establish seven prerequisites:

1. That the witness or witnesses will give newly discovered evidence.

2. That such newly discovered evidence is probably true.

3. That it is competent, material and relevant.

4. That due diligence was used and proper means were employed to procure the testimony at the trial.

5. That the newly discovered evidence is not merely cumulative.

6. That it does not tend only to contradict a former witness or to impeach or discredit him.

7. That it is of such a nature as to show that on another trial a different result will probably be reached and that the right will prevail.

*State v. Britt*, 320 N.C. 705, 712-13, 360 S.E.2d 660, 664 (1987).

I believe defendant has established each of the seven prerequisites in this case. Judge Morgan, after conducting appropriate hearings and listening to the arguments of counsel, found that defendant had met the first six of these prerequisites, but not the seventh. The seventh prerequisite to obtaining a new trial on the basis of newly discovered evidence is that the newly discovered evidence "is of such a nature as to show that on another trial a different result will probably be reached and that the right will prevail." *Britt*, 320 N.C. at 713, 360 S.E.2d at 664.

Judge Morgan found that "the newly discovered evidence is not of such a nature as to show that a different result, i.e. a finding of not guilty *on all submitted bases of guilty*, would probably be reached." (Emphasis added.) Defendant was convicted of first-degree murder under the felony murder rule, on the bases that the murder occurred in the perpetration of four felonies: robbery with a dangerous weapon, rape, sexual offense, and kidnapping. The hearing judge found that while "the State's theory on rape and sexual offense is somewhat weakened by the DNA evidence, its case overall is not fatally flawed." Earlier, the judge found that the newly discovered evidence "would most directly contradict the State's summation when (a) [the assistant special prosecutor] said[,] 'They deposited their semen in her' . . . and (b) [the special prosecutor] referred to a yellow thick aspirated fluid . . . and said[,] '. . . [W]hat was [the victim] thinking when [this man right over here] spread those legs right there apart and he crawled down inside her and he raped and ravaged her and deposited some sickening yellow fluids in her body.' "

Among the newly discovered evidence in this case is a PCR/DNA report that states: "Darryl Hunt is eliminated as a possible source of the genetic material detected in this sample." Given the State's theory that the murder occurred during the perpetration of four felonies, including rape, and the fact that defendant's defense was alibi, the

PCR/DNA report eliminating defendant as the source of the sperm taken from the victim is powerful evidence tending to weaken the State's entire case and strengthen defendant's defense. Thus, I would hold that defendant has established the seventh prerequisite to a new trial: that the newly discovered evidence is of such a nature as to show that on another trial a different result will probably be reached and that the right will prevail.

I vote to allow the motion for appropriate relief by granting defendant a new trial.

Chief Justice EXUM and Justice WEBB join in this dissenting opinion.